706 A.2d 43

MAYOR AND CITY COUNCIL OF BALTIMORE

v.

ONE 1995 CORVETTE VIN No. 1G1YY22P585103433.

No. 209, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Feb. 26, 1998.

692

Kimberly Smith Ward, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Patricia Jessamy, State's Atty. and Rudolph F. Drayton, Asst. State's Atty. for Baltimore City, on the brief), Baltimore, for appellant.

No brief filed by appellee's counsel.

Before MOYLAN and HARRELL, JJ., and ROSALYN B. BELL, Judge (retired, Specially Assigned).

MOYLAN, Judge.

## Outline

I. Procedural History ................................696

II. The Issue.........................................698

III. The High Water Mark of *Mapp v. Ohio* ...............699

IV. Holding the Line Against *Mapp's* Extension ...........702
 F. The Exclusionary Rule Does Not Apply to Grand Jury Proceedings ......................705
 G. The Exclusionary Rule is Not a Factor in Federal Habeas Corpus Review ...................706
 H. The Exclusionary Rule Does Not Apply to Tax Forfeitures of Gambling Proceeds ..............707

**694**

I. The Exclusionary Rule Does Not Apply to Civil
Deportation Proceedings ...................... 709
J. The Exclusionary Rule Does Not Apply to Live
Witnesses Discovered in the Course of a
Fourth Amendment Violation ................. 710
K. The Exclusionary Rule Does Not Apply to the
Impeachment in Rebuttal of Testimonial
Credibility .................................. 711
L. The "Good Faith Exception" to the Application
of the Exclusionary Rule ..................... 712

V. Maryland Cases Recognizing the Limited Reach of
*Mapp's* Exclusionary Rule ......................... 715
A. The Exclusionary Rule Does Not Apply to Sen-
tencing Proceedings .......................... 715
B. The Exclusionary Rule Does Not Apply to
Criminal Contempt ........................... 716
C. The Exclusionary Rule Does Not Apply to Pro-
bation Revocation Proceedings ................. 717
D. The Exclusionary Rule Does Not Apply to the
Termination of Employment for the Commis-
sion of a Crime ............................. 720

VI. The Issue As Viewed Through the Lens of History..... 721

VII. One 1958 Plymouth Sedan ........................ 724

VIII. *Boyd v. United States* Has Been Completely Repudi-
ated ............................................. 726
A. The Intimate Relation of the Fourth and Fifth
Amendments ................................ 728
B. *Boyd's* Application of the Fifth Amendment
Privilege .................................... 734
1. Fifth Amendment Privilege Limited to
Criminal Cases ........................... 735
2. Personal Papers and Documentary Records
No Longer Enjoy a Fifth Amendment
Privilege ................................ 740
C. The Repudiation of *Boyd's* "Mere Evidence
Rule" ...................................... 746
D. The Literal *Boyd* Decision Itself Has Been
Implicitly Overruled .......................... 754
E. *Boyd v. United States:* The Final Requiem ......... 756
1. What *Boyd* Would Do That Would Not
Today Be Done ........................... 759
2. What *Boyd* Would Not Do That Could To-
day Be Done ............................. 759

IX. The "Quasi Criminal" Characterization in *One 1958
Plymouth Sedan* Was Ad–Hoc ...................... 760

X. The Currently Controlling Criteria For What Is
 "Criminal" and what Is "Civil" .....................770

XI. Statutory Forfeitures Generally As Civil *In Rem*
 Actions........................................774
 A. The Innocent Owner Cases .....................775
 B. The Double Jeopardy Cases ....................778

XII. The "Quasi–Criminal" or "Partly Punitive" Hybrid Is
 Now Extinct .....................................781

XIII. Forfeiture Law in Maryland .........................790
 A. Other Maryland Forfeiture Proceedings............791
 B. Earlier Versus Later Forfeiture Laws ............793
 C. Section 297 and Its Federal Counterpart ..........795
 D. The Legislative Scheme of § 297 .................798
 E. The Civil *In Rem* Character of § 297 .............800
 1. The Use of the Civil Burden of Persuasion.....802
 2. The Forfeiture Forum Is a Civil Court ........803
 3. No Criminal Act Need Actually Occur .........804
 4. An Allegedly Innocent Owner Must Prove
 His Innocence............................806
 5. The Significance of § 297's Characteriza-
 tion as "Civil" Goes Beyond the Double
 Jeopardy Clause..........................807

XIV. Conclusion........................................808

■ Does the prophylactic [1] Exclusionary Rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), apply in a civil, *in-rem* forfeiture proceeding in Maryland of an automobile used in the drug trade? No, it does not. Does the case of *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), stand for the broad principle that *Mapp*'s Exclusionary Rule must be applied to all drug-related forfeitures of automobiles regardless of whether those forfeiture proceedings are criminal or civil in

---

1. For several years after *Mapp* was decided in 1961, the Supreme Court on occasion referred to its Exclusionary Rule as something of constitutional stature. For the last twenty-five years, however, the Supreme Court has consistently characterized it as something not itself constitutional but a judicially-created prophylactic rule designed to implement an underlying constitutional right. It is, of course, "constitutional" at least in the limited sense that it must be in order to be binding on the states.

character? A close reading of the opinion reveals that it most certainly does not. In the years since 1965, however, the academic discipline of reading the case closely has been honored more in the breach than in the observance. Has *One 1958 Plymouth Sedan*, whatever it stood for, retained its vitality over the thirty-three years since it was handed down? No, it has not.

## I.

### *Procedural History*

On May 9, 1996, Baltimore City police officers, conducting a surveillance in the 300 block of East Coldspring Lane, stopped a 1995 Chevrolet Corvette based on their belief that the driver had just engaged in a drug transaction. In the course of the stop, the automobile was searched and the following contraband was found: 487 grams of 82% pure cocaine in one large ziplock bag; approximately 12.8 grams of 80% pure cocaine packaged in seven blue ziplock bags; and 35 grams of 81% pure cocaine packaged in five plastic bags. The officers concluded that the automobile was being used to transport drugs. The automobile itself was seized, and the driver, Weldon Connell Holmes, was placed under arrest.[2] At the time of the seizure, Weldon Holmes was the registered owner of the automobile, and the General Motors Acceptance Corporation (GMAC) was the lien holder.

On June 6, 1996, the State's Attorney for Baltimore City filed a complaint in the Circuit Court for Baltimore City seeking forfeiture of the Chevrolet Corvette pursuant to Maryland Annotated Code, Article 27, § 297. In pertinent part, subsection (b), listing the "Property Subject to Forfeiture," includes the following:

---

2. The Baltimore City State's Attorney's Office declined to prosecute Weldon Holmes, dismissing the case at the District Court. As the trial court noted, this dismissal occurred after a consultation between the District Court prosecutor and an Assistant State's Attorney in the specialized Narcotics Unit prior to the preliminary hearing.

(4) All conveyances including ... vehicles ... which are used ... to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled dangerous substances].

...

(10) [A]ll proceeds traceable to ... an exchange [of] a controlled dangerous substance.

Pursuant to subsection (b)(4), the Complaint for Forfeiture included the following allegation:

That on or about the 9th day of May, 1996, Weldon Connell Holmes, and/or his agents used and intended to use the above described motor vehicle while engaged in an unlawful violation of the Controlled Dangerous Substance Law of the State of Maryland by having possession of 487 grams of 82% pure cocaine packaged in one (1) large ziplock, approximately 12.8 grams of 80% pure cocaine packaged in seven (7) blue ziplock bags, and thirty-five (35) grams of 81% pure cocaine packaged in five (5) plastic bags as well as other possible related violations, as proscribed by Article 27 Section 276–302, Annotated Code of Maryland.

As an alternative basis for the forfeiture and pursuant to subsection (b)(10), the Complaint for Forfeiture included the following allegation:

8. That the subject vehicle is a proceed traceable to the profits made from the illegal sales of Controlled Dangerous Substances.

On September 10 and 12, 1996, a hearing was held on the forfeiture action, at which time the defense moved to dismiss the complaint based on the illegal search and seizure of the drugs from the automobile. The trial court denied the motion. The defense renewed its motion to dismiss prior to the testimony of Officer Tony Ellison, one of the officers involved in the search. The motion was again denied. A continuing objection was then made by the defense to the introduction of the drugs seized from the automobile. At the conclusion of all of the testimony, the trial court, despite its two earlier rulings, requested that both counsel submit memoranda of law on the

issue of whether the Exclusionary Rule applied to exclude evidence in a civil forfeiture proceeding.

In a Memorandum and Order dated October 29, 1996, the trial court concluded that the Fourth Amendment had been violated because the police officers lacked probable cause to believe that contraband was located in the automobile. As a result of the Fourth Amendment violation the trial court, relying almost exclusively on *One 1958 Plymouth Sedan*, held that the Exclusionary Rule applies in civil forfeiture cases. In doing so, the court stated, "[t]he rule established by the Supreme Court in *Plymouth Sedan* is still persuasive mandatory authority on this Court. While *Plymouth Sedan* is a 1965 case, it has not been explicitly overruled by the Supreme Court." Accordingly, the trial court ruled that the drugs illegally seized from the automobile could not be admitted at the forfeiture proceeding and dismissed the State's complaint. From that dismissal the State appeals.

No ruling was made with respect to the State's alternative theory of forfeiture, to wit, that the vehicle was "a proceed traceable to the profits made from the illegal sales of Controlled Dangerous Substances."

## II.

### *The Issue*

The single issue before us is that of whether the Exclusionary Rule of *Mapp* should have been applied in the drug-related automobile forfeiture proceeding before the trial court in this case. That question, however, actually transforms itself into one of whether the Supreme Court decision of *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), today dictates (or ever dictated) that *Mapp*'s Exclusionary Rule must apply in all drug-related forfeiture cases. As we shall analyze at some length, it is clear that absent an unequivocal holding to that effect by *One 1958 Plymouth Sedan*, the Exclusionary Rule would not otherwise apply. Everything turns on the current effect of *One 1958 Plymouth Sedan*.

The evidence for our conclusion that the Exclusionary Rule does not apply to a drug-related automobile forfeiture in Maryland and that *One 1958 Plymouth Sedan* does not compel a contrary result is massive. It is, however, circumstantial and needs, therefore, an extensive recounting. For the formal obituary of *One 1958 Plymouth Sedan* (devoutly to be wished), what has been sadly missing is one single, clean stake to the heart. Absent that *coup de grace*, we must undertake the longer analysis.

## III.

### *The High Water Mark of Mapp v. Ohio*

Withholding for the moment our look at *One 1958 Plymouth Sedan* itself, our otherwise uninterrupted view is that of an unrelenting juggernaut that has, at least since the late 1960's, trampled before it any suggestion that *Mapp*'s Exclusionary Rule would be extended to any situation other than that involved in the *Mapp* case itself—the exclusion of evidence obtained in violation of the Fourth Amendment from direct use in a criminal case as part of the State's case in chief on the literal merits of guilt or innocence. In a very real sense, the 1961 filing of the *Mapp* opinion was the high water mark for the *Mapp* philosophy.

In popular usage, particularly among the disenchanted, however, what has happened, at least in the last thirty years, has been characterized as a "retreat from *Mapp*" or as a "receding from *Mapp*'s high water mark." Such characterizations, of course, are not true. Nothing in *Mapp* has been overruled. It stands today for precisely the thing it stood for in June of 1961, neither more nor less. If there has been any sort of a "retreat" or a "receding," it has not been from what *Mapp* was, but only from what many hoped *Mapp* might become. There had been, to be sure, in the immediate and euphoric aftermath of *Mapp*, great expectations in libertarian and defense-oriented circles that the new Exclusionary Rule would soon be extended from one new situation to another. Those expectations may not have been fulfilled, but there has

been no retreat from the literal holding of *Mapp* itself. Neither, however, has there been any advance and that is the larger perspective that must be appreciated to place our present inquiry in its proper historic context.

To understand better the inertia that has restrained any growth by the Exclusionary Rule, one must remember that the Supreme Court arrived at its *Mapp* decision only very reluctantly and only for the lack of a viable alternative. "[W]ithout the . . . rule the assurances against unreasonable . . . searches and seizures would be 'a form of words.' " *Mapp*, 367 U.S. at 655, 81 S.Ct. at 1691. It had been but twelve years since *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), had declined to assign constitutional stature to its federal Exclusionary Rule, adopted by it in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), only pursuant to its supervisory power over the lower federal courts, and had held that the Exclusionary Rule, therefore, did not apply to the states. The *Mapp* Court was sensitive to the stinging criticisms of the exclusionary principle, including the stern rebuke by Chief Judge Cardozo (later Justice of the Supreme Court), as he declined to adopt an exclusionary rule for the State of New York in *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926), that it was absurd that "the criminal go free because the constable has blundered."

The Supreme Court was also alert to the criticism that it was perpetrating one ill in order to cure another,[3] that in the best of all worlds the criminal would go to jail for his crime, which competent evidence, however obtained, demonstrated that he had committed, and that some alternative sanction would be devised to punish the officer who violated the Constitution. The undisputed master of the law of evidence,

---

**3.** As Justice Jackson had observed in *Irvine v. California*, 347 U.S. 128, 136, 74 S.Ct. 381, 385, 98 L.Ed. 561 (1954):

Rejection of the evidence does nothing to punish the wrongdoing official, while it may, and likely will, release the wrong-doing defendant. It deprives society of its remedy against one lawbreaker because he has been pursued by another.

Dean John Henry Wigmore, had railed against perverting the rules of evidence, designed to serve only an intrinsic policy of facilitating the search for truth within the courtroom, in order to serve some extrinsic policy (such as making the police behave). Wigmore had impaled the operation of the Exclusionary Rule on his famous parody:

Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the Constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else.

8 *Wigmore on Evidence* § 2184a (McNaughton ed., 1961), at 31 (Emphasis in original).

*Mapp*'s decision to impose the Exclusionary Rule on the states was made only by a five-to-four vote. Three Justices (Harlan, Frankfurter, and Whittaker) complained bitterly that so seminal a Fourth Amendment decision should not have been taken in a case where the possibility of a federally imposed Exclusionary Rule had not even been raised at the Ohio trial court, in the Ohio Supreme Court, in the application for *certiorari*, in the grant of *certiorari*, in the appellate briefs of the two primary parties (it was urged peripherally in one amicus brief), or in oral argument before the Supreme Court.[4] All the way up the line, the propriety of the conviction had

---

**4.** In his dissenting opinion, Justice Harlan noted:

"The appellant's brief did not urge the overruling of *Wolf.* Indeed, it did not even cite the case." 367 U.S. at 673 n. 5, 81 S.Ct. at 1701 n. 5.

"Counsel for appellant on oral argument, as in his brief, did not urge that *Wolf* be overruled. Indeed, when pressed by questioning from the bench whether he was not in fact urging us to overrule *Wolf,* counsel expressly disavowed any such purpose." 367 U.S. at 673 n. 6, 81 S.Ct. at 1701 n. 6.

been challenged exclusively on First Amendment grounds.[5] One Justice (Stewart) concurred in the decision that Dollree Mapp's conviction should be reversed, but he did so exclusively on First Amendment grounds. He agreed with the three dissenters that the Fourth Amendment issue was not ripe for consideration. *Mapp*, 367 U.S. at 686, 81 S.Ct. at 1708 (concurring and dissenting opinion by Stewart, J.)

Even among the five justices who voted to impose the Exclusionary Rule on the states, only four believed that it was a sanction implicit in the Fourth Amendment. Justice Black could find no charter for the Exclusionary Rule within the four corners of the Fourth Amendment but relied on the so-called "mystic union" between the Fourth and the Fifth Amendments, an idea directly traceable to *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886) [6] and since thoroughly discredited.

## IV.

### *Holding the Line Against Mapp's Expansion*

*Mapp* ignited a firestorm of opposition. Because it had been a decision made with serious misgivings even by the

---

"[I]f the Court were bent on reconsidering *Wolf*, I think that there would soon have presented itself an appropriate opportunity in which we could have had the benefit of full briefing and argument." 367 U.S. at 677, 81 S.Ct. at 1704.

5. Eight years later, *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), finally resolved the issue that had been briefed and argued in *Mapp*, to wit, that the First Amendment prohibited a state from outlawing the non-commercial possession of pornography by an adult in the privacy of the home.

6. I am still not persuaded that the Fourth Amendment, standing alone, would be enough to bar the introduction into evidence against an accused of papers and effects seized from him in violation of its commands. For the Fourth Amendment does not itself contain any provision expressly precluding the use of such evidence, and I am extremely doubtful that such a provision could properly be inferred from nothing more than the basic command against unreasonable searches and seizures.
 *Mapp*, 367 U.S. at 661–62, 81 S.Ct. at 1694–95 (concurring opinion by Black, J.)

*Mapp* Court itself, its germinating capacity was stunted from its very outset. Dashing the hopes of many that it would expand and enjoy numerous more peripheral applications, the Exclusionary Rule essentially froze in its tracks in its infancy, if not literally at its birth.

In a doctrinal sense, the Supreme Court decision that essentially foreclosed any meaningful growth on the part of the Exclusionary Rule was *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). For our present purpose of analyzing both the meaning and the viability of *One 1958 Plymouth Sedan,* the chronological relationship between it and *Linkletter* has some significance. *One 1958 Plymouth Sedan* was decided on April 29, 1965. *Linkletter* was handed down five weeks later on June 7, 1965.

The issue before the Supreme Court in *Linkletter* was that of whether the new rule of *Mapp* (the overruling of *Wolf v. Colorado* ) should be applied retroactively or only prospectively. During the decade of the 1960's, to wit, the criminal law phase of the larger Warren Court revolution, the retroactivity—prospectivity issue arose frequently because of the large number of Supreme Court decisions which overturned prior decisions of diametrically different import. As a general rule of thumb, it was determined that if the new constitutional rule was something that went to "the very integrity of the fact-finding process," *Linkletter,* 381 U.S. at 639, 85 S.Ct. at 1743, the new rule would be applied with full retroactivity no matter what the administrative cost involved or how great the dislocation. *See, e.g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). If, on the other hand, the purpose of the new rule served only a prophylactic function, then there would be no reason gratuitously to incur the cost of retroactive application with no corresponding benefit.

To apply that general rule of thumb to *Mapp* 's Exclusionary Rule, it became necessary to identify the purpose of the Exclusionary Rule. Academically recognized rationales for an exclusionary rule were three in number: 1) to serve the remedial purpose of "making the defendant whole" based on

the notion that the right to have unconstitutionally seized evidence excluded was part of the constitutional entitlement of the defendant himself; 2) the imperative of judicial integrity, to make sure that the judicial system itself did not suffer "unclean hands" by virtue of receiving tainted evidence; and 3) the prophylactic purpose of deterring the police from future Fourth Amendment violations, thereby protecting the innocent as well as the guilty, by eliminating the police incentive to violate the Fourth Amendment. The problem, it turned out, was that *Mapp* had imposed the Exclusionary Rule on the states without ever expressly stating what purpose the Exclusionary Rule was supposed to serve. Identifying the purpose, of course, was indispensable to resolving the retroactivity-prospectivity issue. That glaring gap in the decisional process had to be closed by *Linkletter*. "We must look to the purpose of the *Mapp* rule." *Linkletter*, 381 U.S. at 636, 85 S.Ct. at 1741.

*Linkletter* made it emphatically clear that *Mapp*'s "purpose was to deter the lawless action of the police and to effectively enforce the Fourth Amendment. That purpose will not at this late date be served by the wholesale release of the guilty victims." *Id.* at 637, 85 S.Ct. at 1742. It declared that the Exclusionary Rule "was the only effective deterrent to lawless police action" and that all of the post-*Wolf* Supreme Court cases "requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action." *Id.* at 636–37, 85 S.Ct. at 1741.

In explaining why there was nothing to be achieved by applying the Rule retroactively, the *Linkletter* Court disdained the notion that retrospective exclusion would serve a remedial purpose. "The misconduct of the police prior to *Mapp* had already occurred and will not be corrected by releasing the prisoners involved." *Id.* at 637, 85 S.Ct. at 1742.[7]

---

7. And see *Anne Arundel County v. Chu*, 69 Md.App. 523, 529, 518 A.2d 733 (1987) ("The Exclusionary Rule is not remedial in intent but serves a prophylactic purpose of general deterrence, aimed at curbing future police misconduct.")

The absence of an Exclusionary Rule, moreover, did not derogate from the integrity of the fact-finding process. "To thus legitimate such an extraordinary procedural weapon [the Exclusionary Rule] that has no bearing on guilt would seriously disrupt the administration of justice." 381 U.S. at 637–38, 85 S.Ct. at 1742. "All that the petitioner attacks is the admissibility of evidence, the reliability and relevance of which is not questioned." 381 U.S. at 639, 85 S.Ct. at 1743.

## A. The Exclusionary Rule Does Not Apply to Grand Jury Proceedings

Once *Linkletter* had held that *Mapp*'s purpose was only to deter future police violations of the Fourth Amendment, the doctrinal predicate was established that would keep the Exclusionary Rule fixed firmly within its original boundaries. In *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Supreme Court declined to apply the Exclusionary Rule to proceedings before a grand jury, notwithstanding the fact that the grand jury was considering the same criminal offense from the subsequent trial of which evidence could be excluded. Justice Powell reiterated the limited purpose of the Exclusionary Rule:

> [T]he rule is *a judicially created remedy* designed to safeguard Fourth Amendment rights generally through its deterrent effect, *rather than a personal constitutional right* of the party aggrieved.

414 U.S. at 348, 94 S.Ct. at 620 (Footnote omitted; emphasis supplied). The Supreme Court went on to hold that extending the Exclusionary Rule to grand jury proceedings would achieve, at most, a merely incremental deterrent effect that was not worth the cost:

> Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal.... We therefore decline to embrace a view

that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury.

414 U.S. at 351–52, 94 S.Ct. at 621–22 (Footnote omitted).[8]

### B. The Exclusionary Rule Is Not a Factor in Federal *Habeas Corpus* Review

In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court declined to apply the Exclusionary Rule to federal *habeas corpus* review of state court criminal convictions. The opinion first directed its attention specifically to the third rationale for exclusion, the so-called "imperative of judicial integrity," and concluded that it had a "limited role . . . in the determination whether to apply the rule in a particular context." 428 U.S. at 485, 96 S.Ct. at 3048. "[T]his concern has limited force as a justification for the exclusion of highly probative evidence." *Id.* Through Justice Powell, the Court then reiterated that the purpose of the Exclusionary Rule is a deterrent one and not the protection of a constitutional right of the defendant:

The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights. Post-*Mapp* decisions have established that *the rule is not a personal constitutional right.*

428 U.S. at 486, 96 S.Ct. at 3048 (Emphasis supplied).

The *Stone v. Powell* opinion, perhaps more than any other, described the heavy societal price that is paid when the Exclusionary Rule is applied:

---

**8.** See Judge Rodowsky's similar appraisal of *Calandra* in *Chu v. Anne Arundel County,* 311 Md. 673, 682–83, 537 A.2d 250 (1988):

Under *Calandra,* the federal exclusionary rule would not apply to suppress the use of the Chus' records in the Maryland prosecutor's investigation of possible crime. *A fortiori,* the federal rule does not apply to this civil proceeding brought by the Chus simply to obtain return of the records.

See also *In re Special Investigation No. 228,* 54 Md.App. 149, 183–84, 458 A.2d 820 (1983).

The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, *the physical evidence sought to be excluded is typically reliable* and often the most probative information bearing on the guilt or innocence of the defendant. . . .

*Application of the rule thus deflects the truthfinding process and often frees the guilty.* The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice.

428 U.S. at 489–90, 96 S.Ct. at 3050 (Footnotes omitted; emphasis supplied).

### C. The Exclusionary Rule Does Not Apply To Tax Forfeitures of Gambling Proceeds

In *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), a police search of a bookmaking parlor in Los Angeles produced $4,940 in cash as well as certain wagering records. Prior to the criminal trial of the defendant for violating the gambling laws, a suppression hearing ruled that the search had violated the Fourth Amendment. All of the evidence, including the cash, was excluded from the criminal trial and the prosecution had no choice but to *nol pros* the case against the defendant.

Notwithstanding that adjudication of a clear Fourth Amendment violation, the Internal Revenue Service seized the $4,940 and, using it as a multiplier, assessed the defendant $89,026.09 for unpaid wagering taxes plus interest. They levied directly upon the $4,940 as partial satisfaction of the assessment against the defendant. A federal district judge applied the Exclusionary Rule and determined that the government could neither use the $4,940 as evidence to assess the larger amount nor seize the $4,940 directly. The United States Court of

Appeals for the Ninth Circuit affirmed the suppression for the Fourth Amendment violation.

In reversing, the Supreme Court held that the Exclusionary Rule did not apply to the civil case brought by the IRS either for the larger assessment or for the direct forfeiture of the $4,940 itself. Justice Blackmun's opinion reiterated the limited purpose of the Exclusionary Rule:

> The debate within the Court on the exclusionary rule has always been a warm one. It has been unaided, unhappily, by any convincing empirical evidence on the effects of the rule. The Court, however, has established that *the "prime purpose" of the rule, if not the sole one, "is to deter future unlawful police conduct."*

428 U.S. at 446, 96 S.Ct. at 3028 (Footnote omitted; emphasis supplied).

He went on to point out that the Supreme Court *"never has applied [the Exclusionary Rule] to exclude evidence from a civil* proceeding, federal or state." 428 U.S. at 447, 96 S.Ct. at 3029 (Emphasis supplied). The Supreme Court concluded that the Exclusionary Rule does not have to be applied to such a civil proceeding in order to achieve its deterrent purpose:

> If the exclusionary rule is the strong medicine that its proponents claim it to be, then its use in the situations in which it is now applied (resulting, for example, in this case in frustration of the Los Angeles police officers' good-faith duties as enforcers of the criminal laws) must be assumed to be a substantial and efficient deterrent. Assuming this efficacy, *the additional marginal deterrence provided by forbidding a different sovereign from using the evidence in a civil proceeding surely does not outweigh the cost to society of extending the rule to that situation.* If, on the other hand, the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted. Under either assumption, therefore, *the extension of the rule is unjustified.*

428 U.S. at 453–54, 96 S.Ct. at 3032 (Footnotes omitted; emphasis supplied).

### D. The Exclusionary Rule Does Not Apply to Civil Deportation Proceedings

In holding that the Exclusionary Rule did not apply to yet another type of civil proceeding—a deportation hearing—the case of *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), built on the foundation of *Janis.* One of the deportees in the *Lopez–Mendoza* case had been subjected to a Fourth Amendment-violative seizure of his person. He then made incriminating statements as the unattenuated result of that unconstitutional seizure. The United States Court of Appeals for the Ninth Circuit reversed the deportation order and ruled that the Exclusionary Rule should have barred the use of the evidence. The Supreme Court reversed the Ninth Circuit and held that the Exclusionary Rule was not to be applied in such a civil proceeding.

Although the deportation was a direct result of an earlier criminal act, the unlawful entry into the country, the opinion of Justice O'Connor separated the civil consequence of deportation from the earlier criminal act:

> A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry ...

468 U.S. at 1038, 104 S.Ct. at 3483. The opinion went on to stress the difference between a civil proceeding and a criminal proceeding, notwithstanding the fact that there is some factual overlap between the two:

> A deportation hearing is held before an immigration judge. The judge's sole power is to order deportation; *the judge cannot adjudicate guilt or punish the respondent for any crime* related to unlawful entry into or presence in this country. *Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply* in a deportation hearing.

*Id.* (Emphasis supplied).

Justice O'Connor repeated the earlier observation in *Janis* that the Supreme Court had never applied the Exclusionary Rule to a civil proceeding:

At stake in *Janis* was application of the exclusionary rule in a federal civil tax assessment proceeding following the unlawful seizure of evidence by state ... officials. The Court noted at the outset that *"[i]n the complex and turbulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding,* federal or state."

468 U.S. at 1041–42, 104 S.Ct. at 3485 (Emphasis supplied).

Even after noting that the "arresting officer's primary objective, in practice, will be to use the evidence in the civil deportation proceeding," 468 U.S. at 1043, 104 S.Ct. at 3485, the Supreme Court nonetheless concluded that the Exclusionary Rule had no applicability in a civil deportation proceeding:

[W]e conclude that application of the rule in INS civil deportation proceedings, as in the circumstances discussed in *Janis,* "is unlikely to provide significant, much less substantial, additional deterrence." *Important as it is to protect the Fourth Amendment rights of all persons, there is no convincing indication that application of the exclusionary rule in civil deportation proceedings will contribute materially to that end.*

468 U.S. at 1046, 104 S.Ct. at 3487 (Citation omitted; emphasis supplied).

As early as 1923, the Supreme Court, speaking through Justice Brandeis, held in *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), that even when a deportation petition is the direct consequence of a criminal violation, the deportation hearing itself is civil in nature. As an inherent aspect of the civil proceeding, the protections that ordinarily attend a criminal trial—in that case the privilege against compelled self-incrimination—are not applicable.

**E. The Exclusionary Rule Does Not Apply to Live Witnesses Discovered in the Course of a Fourth Amendment Violation**

In *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), the Supreme Court declined to apply the

Exclusionary Rule even to certain aspects of the criminal trial itself. The appellant was convicted of a gambling violation. A clear Fourth Amendment violation—picking up an envelope from a cash register, opening it, and discovering both money and policy slips—led to the discovery of a key witness against the appellant. Utilizing a "fruit of the poisonous tree" analysis, the United States District Court ruled that the testimony of the witness should be excluded because the government's awareness of the witness's identity and value was the product of the Fourth Amendment violation. The United States Court of Appeals for the Second Circuit affirmed the suppression ruling.

The Supreme Court reversed that suppression, holding that the Exclusionary Rule under the circumstances of that case should not extend to barring the use of a live witness even from the criminal trial itself.

### F. The Exclusionary Rule Does Not Apply to the Impeachment in Rebuttal of Testimonial Credibility

In *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the Supreme Court further limited the applicability of the Exclusionary Rule even in the trial of the criminal case itself.[9] The appellant, an attorney, was convicted of importing illegal drugs into the United States from Peru. The warrantless search of his suitcase at the Miami airport was so flagrantly a violation of the Fourth Amendment that the government did not even attempt to offer the product of that search in its case in chief. After the appellant made certain responses in the course of his cross-examination, however, the government sought to use the products of that search in rebuttal for the purpose of impeaching his testimonial credibility. The United States Court of Appeals for the Fifth Circuit reversed the appellant's conviction, ruling that

---

**9.** See this Court's summary of the consistent trend of the Supreme Court cases in *Anne Arundel County v. Chu,* 69 Md.App. 523, 531, 518 A.2d 733 (1987).

the unconstitutionally seized evidence should have been suppressed.

The Supreme Court, in turn, reversed the Fifth Circuit, holding that the Exclusionary Rule should not bar the use of Fourth Amendment-violative evidence for the purpose of impeaching testimonial credibility, regardless of whether the testimony to be impeached emanated from direct examination or cross-examination. Justice White reasoned for the Court:

> We also think that the policies of the exclusionary rule no more bar impeachment here than they did in *Walder* [*v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954)], *Harris* [*v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)], and [*Oregon v.*] *Hass* [420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)]. In those cases, the ends of the exclusionary rules were thought adequately implemented by denying the government the use of the challenged evidence to make out its case in chief. The incremental furthering of those ends by forbidding impeachment of the defendant who testifies was deemed insufficient to permit or require that false testimony go unchallenged, with the resulting impairment of the integrity of the factfinding goals of the criminal trial. We reaffirm this assessment of the competing interests, and hold that a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt.

446 U.S. at 627–28, 100 S.Ct. at 1916–17.[10]

## G. The "Good Faith Exception" to the Application of the Exclusionary Rule

With the promulgation of the "good faith exception" to the Exclusionary Rule in *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) and *United States*

---

**10.** See *In re Special Investigation No. 228*, 54 Md.App. 149, 184, 458 A.2d 820 (1983).

*v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court did, to be sure, not simply hold the line against further expansion of the Exclusionary Rule but actually cut back on its applicability.

That cutback, of course, had been logically foreshadowed from as early as 1965 when *Linkletter v. Walker* held that the only generative purpose behind the Rule was that of deterrence and that that deterrence, moreover, was aimed only at the police. It followed from that limited purpose that the Rule should only be applied in those situations where it would truly deter Fourth Amendment violations by the police rather than on every occasion when the Fourth Amendment was actually violated. In *Sheppard* and *Leon* the police were deemed to have acted reasonably and, therefore, to have been in no need of deterrence where they had relied in good faith on judicially issued search and seizure warrants. In deferring to the judicial branch of government, the police had acted with quintessential reasonableness. The judge who issued the warrant may have made a mistake but the Exclusionary Rule is not aimed at deterring judicial mistakes.[11]

The "good faith exception" expanded further three years later when *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), held that the police had acted reasonably and were, therefore, in no need of deterrence where they had relied in good faith on a duly enacted Illinois statute, notwithstanding the fact that the statute was later determined to have authorized violations of the Fourth Amendment. The "good faith exception" continued to expand when *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), held that the police had acted reasonably and were, therefore, in no need of deterrence when they had relied in good faith on computerized misinformation and where the source of the misinformation had been clerical mistakes in the judicial branch of government.

For present purposes, the significance of the opinion in *United States v. Leon* is in Justice White's thorough analysis

---

11. See *Howell v. State,* 60 Md.App. 463, 467, 483 A.2d 780 (1984).

of the purpose and the scope of *Mapp*'s Exclusionary Rule. He made it unmistakably clear that the Rule is a judicially created prophylactic remedy and not part of the constitutional entitlement of the defendant:

> The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "work[s] no new Fourth Amendment wrong." The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, and the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." *The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."*

468 U.S. at 906, 104 S.Ct. at 3411–12 (Citations omitted; emphasis supplied). The Supreme Court again pointed out the heavy societal cost exacted by the Rule as the reason why it should be restricted to those cases where it is absolutely necessary:

> The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury."

468 U.S. at 907, 104 S.Ct. at 3412.

Whatever the earlier and looser rhetoric of the Supreme Court may have been, the *Leon* opinion pointed out that "close attention" to the purpose sought to be accomplished by the Rule "has characterized our recent decisions concerning the scope of the Fourth Amendment exclusionary rule." 468 U.S. at 908, 104 S.Ct. at 3413. In keeping a constant eye on the purpose to be served, the Supreme Court had consistently

declined to extend the Exclusionary Rule to proceedings other than the criminal trial itself. The *Leon* Court reiterated that in *Janis* it had declined to extend the Rule to civil proceedings:

> *Proposed extensions of the exclusionary rule to proceedings other than the criminal trial itself have been evaluated and rejected* under the same analytic approach....[I]n *United States v. Janis* we permitted the use in federal civil proceedings of evidence illegally seized by state officials since the likelihood of deterring police misconduct through such an extension of the exclusionary rule was insufficient to outweigh its substantial social costs.

468 U.S. at 909, 104 S.Ct. at 3413 (Citation omitted; emphasis supplied).

## V.

### *Maryland Cases Recognizing the Limited Reach of Mapp's Exclusionary Rule*

On at least six occasions the appellate courts of Maryland have been called on to determine whether *Mapp v. Ohio*'s Exclusionary Rule has any applicability beyond the literal adjudication of guilt or innocence at the criminal trial itself. On each such occasion, the answer has been "No."

### A. The Exclusionary Rule Does Not Apply to Sentencing Proceedings

In *Logan v. State*, 289 Md. 460, 425 A.2d 632 (1981), the Court of Appeals considered the applicability of the Rule to a sentencing proceeding. At the sentencing of a defendant for housebreaking, evidence was introduced of six other offenses which the defendant had committed but for which he had not been tried. The proof that the defendant had committed those uncharged offenses was a series of six confessions by him. The confessions, however, had been forthcoming only when the defendant was confronted with a set of master keys that had been unconstitutionally seized by the police.

The appellant sought to convince the Court of Appeals that *Mapp*'s Exclusionary Rule "is applicable not solely to the

'guilt determination' stage of a criminal trial, but also to the sentencing phase." 289 Md. at 483, 425 A.2d 632. In rejecting the argument, Judge Digges pointed out "[t]hat the exclusionary rule is a judicially-created requirement of policy calculated to prevent, not to repair." *Id.* After analyzing the Supreme Court's historical rejection of other rationales in favor of that of deterrence, 289 Md. at 483–84, 425 A.2d 632, he concluded the summary:

> In keeping with *this narrowing conception of the application and utility of the rule,* the Supreme Court has consistently refused to extend its reach beyond the area traditionally within the rule's purview.

289 Md. at 484, 425 A.2d 632 (Emphasis added).

After examining at length the Supreme Court philosophy expressed in *Calandra* and noting that "[m]ost illegally-obtained evidence is not inherently unreliable," 289 Md. at 485, 425 A.2d 632, the Court of Appeals concluded that the "Supreme Court doctrine does not extend to the sentencing stage of a criminal case." 289 Md. at 486, 425 A.2d 632.

## B. The Exclusionary Rule Does Not Apply to Criminal Contempt

In *Whitaker v. Prince George's County,* 307 Md. 368, 514 A.2d 4 (1986), the appellants, who had been enjoined from continuing to operate a public nuisance (a bawdy-house), were found to be in criminal contempt for flouting that injunction. On appeal, they claimed that they had been denied the opportunity even to litigate the Fourth Amendment propriety of the police search that had produced the evidence against them. Speaking through Judge Couch, the Court of Appeals held that the propriety of the search was immaterial because, good search or bad search, the Exclusionary Rule did not apply:

> [T]hough the consequences of the County's suit may be grave, it is not a criminal proceeding and *in no sense is the action vindictive or punitive.* Rather, the proceedings only seek determination of whether appellants engaged in prostitution-related activities and, if so, whether those activities

should be enjoined, and whether those activities were violative of certain court orders. In such a case *the use in evidence of that which might be excluded in a criminal trial does not involve a constitutionally protected interest.*

307 Md. at 383, 514 A.2d 4 (Emphasis supplied).

The Court of Appeals pointed out that the Supreme Court's *Janis* opinion had "severely undermined" earlier state and federal decisions which had applied the Exclusionary Rule to civil proceedings:

While the Supreme Court has never directly applied the exclusionary rule in a civil case, it ruled in *Janis, supra,* that evidence illegally seized by state agents in good faith and in reliance on a warrant may be used in a federal civil tax proceedings. *Though the ruling cannot be said to stand for the proposition that evidence may never be excluded in a civil proceeding, it nonetheless severely undermined those cases in lower courts which applied the exclusionary rule to civil proceedings.*

307 Md. at 382, 514 A.2d 4 (Emphasis supplied).

After noting "the cost to society in excluding what might concededly be relevant and reliable evidence," 307 Md. at 383, 514 A.2d 4, the Court opined as to the emerging intention of the Supreme Court in terms of confining the Exclusionary Rule:

*The language of Calandra, coupled with the Court's refusal to extend the exclusionary rule to a civil proceeding in Janis,* albeit upon a rationale which is not applicable in the instant case, supports this conclusion and *is suggestive of that Court's intention to limit the applicability of the exclusionary rule to criminal proceedings.*

307 Md. at 384, 514 A.2d 4 (Emphasis supplied).

## C. The Exclusionary Rule Does Not Apply to Probation Revocation Proceedings

In *Chase v. State,* 68 Md.App. 413, 511 A.2d 1128 (1986), this Court stated the issue at the very outset of the opinion:

Under current Constitutional doctrine, evidence seized by a policeman without a warrant and in violation of a person's

Fourth Amendment rights ordinarily may not be used by the State to convict the person of a criminal offense. *The principal question in this appeal is whether such evidence may be used in a probation revocation proceeding* for the purpose of showing that the person has violated a condition of his probation.

68 Md.App. at 414–15, 511 A.2d 1128 (Emphasis supplied).

The appellant, a probationer for an earlier conviction, was arrested and indicted for a fresh crime. A suppression hearing judge found the warrantless arrest of the appellant to have been without probable cause and, therefore, ordered all evidence of a drug transaction excluded from the appellant's pending criminal trial. As a direct result of that ruling, the State dismissed all criminal charges. It persisted, however, with its petition to revoke the appellant's probation based on the very same evidence.

The opinion of Judge Wilner (now of the Court of Appeals) joined in by Judge Robert M. Bell (now Chief Judge of the Court of Appeals) thoroughly analyzed the development of the Supreme Court's attitude toward the Exclusionary Rule from *Mapp v. Ohio* (1961) through *United States v. Leon* (1984). 68 Md.App. at 418–21, 511 A.2d 1128. After noting that *Mapp* had "spoke[n] in rather dogmatic terms," 68 Md.App. at 418, 511 A.2d 1128, but that the Supreme Court had, early on, "viewed the exclusionary rule as a deterrent, rather than a redressive measure," 68 Md.App. at 419, 511 A.2d 1128, the opinion described the growing stinginess of the Supreme Court in applying the Exclusionary Rule:

Upon that rationale, and *despite the broad doctrinal language in Mapp, the Court,* while periodically reaffirming the need for and continued existence of the exclusionary rule in Fourth Amendment cases, eventually *began to open some holes in the Constitutional net it had thrown over improperly seized evidence.*

68 Md.App. at 419, 511 A.2d 1128 (Emphasis supplied).

Notwithstanding the *in personam* nature of a probation revocation proceeding, contrasted with the *in rem* character of

a forfeiture proceeding, and notwithstanding the inevitably penal effect on one whose probation has been revoked, the Court declined to impose the Exclusionary Rule:

We align ourselves with the majority of courts that have declined to extend in any general fashion the Fourth Amendment exclusionary rule to probation revocation proceedings. We agree, as a general proposition, that the deterrent effect of such an application will be minimal and that whatever marginal deterrent benefit might accrue would be far outweighed by the harmful effect of denying access to relevant information concerning a probationer's behavior.

68 Md.App. at 425, 511 A.2d 1128.

In *Chase v. State,* 309 Md. 224, 522 A.2d 1348 (1987), the Court of Appeals affirmed. The opinion of Judge Orth held that "[i]n Maryland, the revocation of probation is considered to be a civil proceeding" notwithstanding the fact that it "relates directly to the criminal case of the substantive offense." 309 Md. at 238, 522 A.2d 1348. Looking to *Howlett v. State,* 295 Md. 419, 456 A.2d 375 (1983) and *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), the Court of Appeals noted:

It is firmly established as a civil action, and, as we have noticed above, *the probationer is not cloaked with the full panoply of constitutional rights and procedural safeguards enjoyed by a defendant in a criminal cause.*

309 Md. at 239, 522 A.2d 1348 (Emphasis supplied). The holding of the Court was clear:

*[T]he mere fact that the evidence sought to be admitted at the revocation hearing was suppressed as illegally seized at the criminal trial* of Chase *provides,* in itself, *no sound reason to exclude it at his revocation hearing.* Nor, as we have seen, does the fact that Chase was not convicted of the criminal charges arising from the evidence, render the evidence inadmissible at his revocation hearing.

309 Md. at 243, 522 A.2d 1348 (Emphasis supplied).

Highly pertinent for present purposes is Judge Orth's indepth examination of the evolving Supreme Court attitude

toward the Exclusionary Rule. He observed that "[i]n a revealing opinion in *United States v. Leon*," the Supreme Court "laid to rest [*Mapp*'s] notion that the exclusionary rule is a necessary corollary of the Fourth Amendment or that the rule is required by the conjunction of the Fourth and Fifth Amendments." 309 Md. at 244–45, 522 A.2d 1348. Significantly, the Court of Appeals further noted that the "imprimatur of the Supreme Court on *the application of the exclusionary rule has been confined to criminal trials,* and within those trials, to the prosecution's case in chief on the merits of guilt or innocence." 309 Md. at 245–46, 522 A.2d 1348 (Emphasis supplied). The Court of Appeals based its conclusion that the Supreme Court would not apply the Exclusionary Rule to probation revocation proceedings on the fact that the Supreme Court had consistently rejected the application of the Rule to any proceedings other than the criminal trial itself:

> [*I*]*ts evaluation and rejection of the application of the rule to proceedings other than the criminal trial itself* leads to a logical conclusion that, consistent with its other decisions, the rule would not generally apply to our revocation proceedings.

309 Md. at 249, 522 A.2d 1348 (Emphasis supplied).

## D. The Exclusionary Rule Does Not Apply to the Termination of Employment for the Commission of a Crime

In *Sheetz v. City of Baltimore*, 72 Md.App. 51, 527 A.2d 787 (1987), a correctional officer was arrested for trafficking in narcotic drugs. In the criminal case, the evidence was suppressed for its having been unconstitutionally seized. As a result, the State dropped all criminal charges. In a subsequent civil proceeding, however, the Warden of the Baltimore City Jail succeeded in having the defendant's employment terminated on the basis of that criminal offense. Notwithstanding our determination that "[d]epriving an individual of his employment is a penalty of serious magnitude," 72 Md. App. at 58, 527 A.2d 787, this Court, after surveying both the Supreme Court and the Court of Appeals cases on the subject,

declined to apply the Exclusionary Rule to the employment termination proceedings:

We recognize that the administrative disciplinary proceeding now before us is neither the revocation of probation proceeding of *Chase* nor the public nuisance-contempt action of *Whitaker*. *The Court's refusal, however, to extend the exclusionary rule beyond proceedings, the object of which is purely punitive, is a strong indication that the rule should not be applied here.*

72 Md.App. at 62, 527 A.2d 787 (Emphasis supplied).

In *Sheetz v. City of Baltimore*, 315 Md. 208, 553 A.2d 1281 (1989), the Court of Appeals affirmed, observing:

The police are responsible for punishing criminals by enforcing criminal laws. Thus they are not, as a general rule, primarily concerned with regulating the quality of employment at a particular governmental agency. Because their primary interest is not typically in discharge proceedings, the police are not especially tempted to violate the fourth amendment in order to obtain evidence for such proceedings. Therefore, in this context, the exclusionary rule, designed to deter such violations, is not particularly useful. Because we find that the exclusionary rule offers only minimal deterrent benefits in this particular context, we conclude that the rule does not generally apply to administrative discharge proceedings.

315 Md. at 215, 553 A.2d 1281 (Footnote omitted).

## VI.

### *The Issue As Viewed Through the Lens of History*

As thus refracted through one-third of a century of increasingly sophisticated Exclusionary Rule analysis and doctrinal refinement, the precise issue before us—that of whether *Mapp* applies to a civil *in rem* drug-related automobile forfeiture proceeding in Maryland—takes on a very different coloration than it might have if viewed in an uncritical vacuum. No previous Maryland decision has ever squarely addressed this issue. Passing reference to *One 1958 Plymouth Sedan*

has, to be sure, been made but only by way of *dicta* and only in the course of considering (and rejecting) other possible applications of the Exclusionary Rule.

To the extent to which that 1965 Supreme Court opinion is presently susceptible of fresh examination and analysis, the tidal flow of history has been relentlessly away from applying the Exclusionary Rule in a civil forfeiture proceeding. That tidal flow of history is immaterial, of course, if the unequivocal holding of *One 1958 Plymouth Sedan* absolutely forecloses any interpretation other than one mandating the application of the Exclusionary Rule to every crime-related forfeiture proceeding at all times and under all circumstances.

Because such a result would be so freakishly aberrational [12] and inconsistent with what is now the long prevailing Supreme

---

**12.** Lest the language "freakishly aberrational" be frowned upon as unduly harsh, let us pose a hypothetical in support of that characterization.

Posit a Colombian drug courier, illegally in the United States with false identity papers, piloting a small plane from Miami to New York. Short on fuel, the plane is forced to make an emergency landing on Interstate 95 in Cecil County, Maryland. On a pretext, state troopers warrantlessly search the plane and recover fifty kilos of high-grade cocaine, $100,000 in cash, personal letters establishing the true identity of the pilot, and an address book listing the names of customers in New York.

If the pilot seeks to suppress the unconstitutionally seized evidence so that it may not be considered by the Cecil County grand jury, it will be ruled that the Exclusionary Rule does not apply. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). If the pilot is convicted of the unlawful possession of cocaine and later seeks to attack that conviction by way of federal *habeas corpus*, it will be ruled that the Exclusionary Rule does not apply. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). If the Internal Revenue Service seizes the $100,000 in cash, following the pilot's acquittal, and the pilot seeks to have the cash returned or excluded from a tax assessment proceeding, it will be ruled that the Exclusionary Rule does not apply. *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). If the pilot seeks to have excluded from his deportation hearing the unconstitutionally seized letters that proved his true identity, it will be ruled that the Exclusionary Rule does not apply. *Immigration and Naturalization Service v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). If the pilot seeks to suppress the testimony of his would-be contacts in New York, whose identities would never have been discovered but for the unconstitution-

Court attitude, however, an in-depth examination of *One 1958 Plymouth Sedan* is appropriate. Was the decision in actual fact a sweeping statement of universal applicability? If so, *stare decisis* gives us no option but to apply it, no matter how aberrational. Or did that opinion hinge, perhaps, on the special facts, the special circumstances, and/or the special intermediate premises arrived at and syllogistically relied on in the course of the opinion? If so, that would present a very different picture. If the thrust of the decision is ambiguously problematic, moreover, the currently prevailing doctrinal climate would dictate that it be given a narrow reading so as to minimize any incongruity with its surrounding context rather than a broad one that would highlight its anomalous character. At the very least, the actual holding of *One 1958 Plymouth Sedan* is a subject for legitimate, and long overdue, inquiry. Our concern, of course, must be not with how the headnotes

---

ally seized address book, it will be ruled that the Exclusionary Rule does not apply. *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). If the pilot, after testifying at the criminal trial that he was not carrying drugs, seeks to suppress the physical evidence when it is offered to impeach his testimonial credibility, it will be ruled that the Exclusionary Rule does not apply. *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).

If the pilot seeks to suppress the unconstitutionally seized evidence at his sentencing hearing, it will be ruled that the Exclusionary Rule does not apply. *Logan v. State,* 289 Md. 460, 425 A.2d 632 (1981). If the pilot seeks to exclude the evidence from his contempt hearing for violating an earlier injunction of the Cecil County Circuit Court not to enter that county with drugs, it will be ruled that the Exclusionary Rule does not apply. *Whitaker v. Prince George's County,* 307 Md. 368, 514 A.2d 4 (1986). If the pilot seeks to exclude the evidence from the hearing to revoke his earlier probation, it will be ruled that the Exclusionary Rule does not apply. *Chase v. State,* 309 Md. 224, 522 A.2d 1348 (1987). If the pilot seeks to exclude the evidence from the administrative hearing seeking to terminate his employment as an adjunct member of the Cecil County Sheriff's Department, it will be ruled that the Exclusionary Rule does not apply. *Sheetz v. City of Baltimore,* 315 Md. 208, 553 A.2d 1281 (1989).

In the face of that anti-Exclusionary Rule phalanx, the notion that the Exclusionary Rule would incongruously apply to a proceeding seeking to forfeit the airplane, either to state or federal authorities, on the ground that it had been an instrumentality in the unlawful transportation of illicit drugs is a notion that would be, in that larger context, freakishly aberrational.

and the annotations have simplistically distilled the case into a single sentence (and with how most courts,. therefore, have applied it) but with *what* the opinion itself actually says and, ·most especially, with *why* it says it.

## VII.

### *One 1958 Plymouth Sedan*

· The majority opinion of Justice Goldberg consisted of nine ·pages in the United States Reports.[13] Two and one-half of those pages was devoted to the factual and procedural history of the case. 380 U.S. at 694–96, 85 S.Ct. at 1247–48. Two officers of the Pennsylvania Liquor Control Board, noticing that George McGonigle's 1958 Plymouth sedan was riding "low in the rear, quite low," stopped it just after it crossed the Benjamin Franklin Bridge from Camden, New Jersey, into Philadelphia. The officers warrantlessly searched the car and recovered, from the rear and from the trunk, 31 cases of liquor not bearing Pennsylvania tax seals. Both. the car and the liquor were seized. McGonigle was arrested and charged with a violation of Pennsylvania law.

The Commonwealth also petitioned for the forfeiture of the 1958 Plymouth under a statute which authorized the forfeiture of, *inter alia,* "any ... vehicle ... used in the illegal ... transportation of liquor." McGonigle sought to have the petition dismissed on the ground that the case for forfeiture depended on the admission of evidence unconstitutionally ob-tained in violation of the Fourth Amendment. The trial judge agreed and dismissed the petition, ruling that the officers had acted without probable cause. The intermediate appellate court reversed the trial court, holding that probable cause had been shown.[14] The Supreme Court of Pennsylvania affirmed

---

**13.** In a two-page concurring opinion, Justice Black took issue with the proposition that the Supreme Court possessed the authority to adopt the Exclusionary Rule as a matter of judicial policy. He argued, as he had in *Mapp,* that the Exclusionary Rule was constitutionally mandated by the combination of the Fourth and Fifth Amendments.

**14.** *Commonwealth v. One 1958 Plymouth Sedan,* 199 Pa.Super. 428, 186 A.2d 52 (1962).

the reversal, but for a different reason, holding that the Exclusionary Rule of *Mapp* did not apply to a forfeiture proceeding which that court deemed to be civil in nature.[15]

Of the six and one-half pages then devoted to a discussion of the law, no less than four and one-half of those pages consisted exclusively of 1) the citation to *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), as the "leading case on the subject of search and seizure;" 2) a complete summary of *Boyd;* and 3) extensive quotation, with approval, from *Boyd.* 380 U.S. at 696–700, 85 S.Ct. at 1248–51. The remaining two pages dispositively analogized the forfeiture in *One 1958 Plymouth Sedan* to the 1884 forfeiture proceeding, labeled as "quasi-criminal in character," with which *Boyd* had dealt. 380 U.S. at 700–02, 85 S.Ct. at 1250–52.

A cursory reading of *One 1958 Plymouth Sedan* reveals the self-evident truism that its rationale rests so completely and exclusively on the foundation of *Boyd* that 1) if *Boyd* is still good law, then so is *One 1958 Plymouth Sedan;* but 2) if *Boyd* is no longer good law, then neither is *One 1958 Plymouth Sedan.*

Our conclusion that *One 1958 Plymouth Sedan* does not mandate the application of *Mapp*'s Exclusionary Rule to the present forfeiture proceeding rests on either of two alternative and independent bases. The first is that the doctrinal foundation of *Boyd,* on which *One 1958 Plymouth Sedan* was erected and on which it depends, has been completely undermined. *One 1958 Plymouth Sedan* was built on a foundation of sand and the sand has totally washed away.

The second basis for our conclusion is that *One 1958 Plymouth Sedan* did not presume to announce a sweeping proposition with respect to all forfeitures, regardless of whether they might ultimately be deemed criminal or civil in character. It was rather the case that the Supreme Court, relying on some fact-specific circumstances that it recounted in detail, treated the particular forfeiture before it as criminal and punitive in

---

**15.** *Commonwealth v. One 1958 Plymouth Sedan,* 414 Pa. 540, 201 A.2d 427 (1964).

character. It is true that the Pennsylvania Supreme Court had labeled the forfeiture proceeding as civil, but the Supreme Court, relying both on the *Boyd* analogy and the special fact that the automobile to be forfeited had twice the monetary value of the maximum fine that could be imposed, overrode the Pennsylvania court's determination in that regard. In *United States v. Janis*, 428 U.S. 433, 447, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046, 1057 (1976), the Supreme Court, after making the unqualified statement,

> "In the complex and turbulent history of the [Exclusionary Rule], *the Court never has applied it to exclude evidence from a civil proceeding,* federal or state,"

(Footnote omitted; emphasis supplied) then explained away the apparent exception of *One 1958 Plymouth ·Sedan.* as no true exception at all. *Janis* interpreted its earlier decision as one expressly dependent on the criminal nature of that particular forfeiture:

> There [in *One 1958 Plymouth Sedan]* it *[the Court] expressly relied on the fact that "forfeiture is clearly a penalty for the criminal offense"* and "[i]t would be anomalous indeed, *under these circumstances,* to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible."

428 U.S. at 447, n. 17, 96 S.Ct. at 3029, n. 17 (Emphasis supplied). *One 1958 Plymouth Sedan,* thus refracted through the prism of *Janis,* is reduced to a very narrow and fact-specific holding, indeed. The holding that *that particular forfeiture proceeding* was criminal in nature does not dictate the conclusion that *all forfeiture proceedings* must always be deemed criminal in nature.

## VIII.

### *Boyd v. United States Has Been Completely Repudiated*

We will examine, individually, each of those alternative bases for our ultimate conclusion. The first inquiry concerns *One 1958 Plymouth Sedan*'s total reliance on *Boyd* and,

inevitably, concerns the efficacy of relying on a case that has since been completely drained of whatever vitality it may have possessed in 1965.

Although a series of Supreme Court decisions in the 1970's "sounded the death knell for *Boyd* [*v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) ]" [16] and in 1984 *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677, concluded that *Boyd*'s doctrinal underpinnings had "not withstood critical analysis or the test of time," [17] the *Boyd* opinion was nonetheless one that for the first eighty years of its life enjoyed almost hallowed status. In 1928, Justice Brandeis described it as "a case that will be remembered as long as civil liberty lives in the United States." [18] *One 1958 Plymouth Sedan,* now under review, began its legal analysis by deferring to *Boyd* as "the leading case on the subject of search and seizure." 380 U.S. at 696, 85 S.Ct. at 1248.

The irony of *Boyd*'s having been described as "the leading case on ... search and seizure" is that the governmental activity which it was reviewing did not involve anything that the modern world would even recognize as a search or a seizure. The United States Attorney for the Southern District of New York had petitioned to have thirty-five cases of plate glass forfeited to the United States on the ground that they had been imported into the United States without the required customs duty having been paid. In order to prove its case against the company of E.A. Boyd & Sons, the government persuaded the federal judge to issue a *subpoena duces tecum* on E.A. Boyd & Sons requiring it to produce the invoice for twenty-nine cases of previously imported plate glass. The

---

**16.** This conclusion was that of Justice O'Connor in *United States v. Doe,* 465 U.S. 605, 618, 104 S.Ct. 1237, 1245, 79 L.Ed.2d 552 (1984) (concurring opinion by O'Connor, J.)

**17.** *See also Fisher v. United States,* 425 U.S. 391, 407, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976).

**18.** *Olmstead v. United States,* 277 U.S. 438, 474, 48 S.Ct. 564, 570–71, 72 L.Ed. 944 (1928) (dissenting opinion by Brandeis, J.)

Boyd Company complied with the court order and produced the invoice. Over objection, the invoice was admitted in evidence. The jury returned a verdict in favor of the United States, condemning the thirty-five cases of plate glass as subject to forfeiture. On appeal, the Supreme Court reversed the decision of the trial court.

There was no contention that every procedural nicety had not been punctiliously observed. The only claim made by Boyd was that compliance with the judicially issued subpoena would have required the company to incriminate itself. There was, therefore, nothing before the Supreme Court that would have raised, to the modern eye, any question remotely involving a Fourth Amendment search and seizure, let alone an unreasonable search and seizure. Under prevailing present-day law, *Boyd* cannot be characterized as a Fourth Amendment case.

By no stretch of reasoning, moreover, may *Boyd* today serve as the justification or the authorization for the Fourth Amendment's Exclusionary Rule. The very notion of an Exclusionary Rule was not even considered by the Supreme Court until its decision in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), twenty-eight years after the *Boyd* case was decided. The Exclusionary Rule is a judicially created prophylactic device aimed exclusively at deterring and thereby preventing *Fourth Amendment* violations. Nothing in *Boyd* had anything to do with serving that deterrent purpose. *Boyd*'s holding that the invoice should never have been received in evidence was based on its conclusion that the use of the invoice, following its compulsory production, violated Boyd's *Fifth Amendment* privilege against compelled self-incrimination. That Fifth Amendment consideration, which has not itself stood the test of time, is not conceivably a predicate for the Fourth Amendment's Exclusionary Rule.

### A. The Intimate Relation of the Fourth and Fifth Amendments

At the most fundamental level, *One 1958 Plymouth Sedan* relied on *Boyd* for the proposition that the Fourth Amend-

ment's Exclusionary Rule applied to a forfeiture proceeding. *Boyd,* of course, did not involve any consideration of the Exclusionary Rule; *Boyd* was decided 28 years ago before the Supreme Court first even considered the Exclusionary Rule in a true Fourth Amendment context in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). What *One 1958 Plymouth Sedan* did was to confect a Fourth Amendment Exclusionary Rule out of what had been, in *Boyd,* a holding that a proceeding could not be affirmed if it was based on evidence that was inadmissible because it compelled an individual to be a witness against himself in contravention of the Fifth Amendment privilege against compelled self-incrimination.

That latter-day confection of the Exclusionary Rule was possible because of *Boyd*'s now repudiated commingling of the Fourth and Fifth Amendments. Involved in *Boyd* was a procedurally impeccable *subpoena duces tecum* for documentary records. *Boyd* began its commingling of the two amendments by asserting that the serving of a *subpoena duces tecum* on an individual for documentary records was, *ipso facto,* a Fourth Amendment search and seizure. The next premise in the syllogism was that compliance with such a subpoena would amount to compelled self-incrimination, thereby making the search and seizure an unreasonable one. Justice Bradley's opinion acknowledged that such a constructive "search and seizure" might be less aggravating than an actual one but that the two amendments nonetheless "run almost into each other:"

> Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard *the Fourth and Fifth Amendments run almost into each other.*

116 U.S. at 630, 6 S.Ct. at 532 (Emphasis supplied).

Justice Bradley pursued the "intimate relation" between the two amendments:

We have already noticed *the intimate relation between the two amendments.* They throw great light on each other. For the "unreasonable searches and seizures" condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and *compelling a man "in a criminal case to be a witness against himself,"* which is condemned in the Fifth Amendment, *throws light on the question as to what is an "unreasonable search and seizure" within the meaning of the Fourth Amendment.*

116 U.S. at 633, 6 S.Ct. at 534 (Emphasis supplied).

The heart of the *Boyd* holding—1) that the compelled production of private papers is a search and seizure, 2) that it is compelled self-incrimination, and 3) that it is, therefore, an unreasonable search and seizure—is found at 116 U.S. at 622, 6 S.Ct. at 527–28:

It is true that certain aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching amongst his papers, are wanting, and to this extent the proceeding under the act of 1874 is a mitigation of that which was authorized by the former acts; but it accomplishes the substantial object of those acts in forcing from a party evidence against himself. It is our opinion, therefore, that *a compulsory production of a man's private papers* to establish a criminal charge against him, or to forfeit his property, *is within the scope of the Fourth Amendment* to the Constitution, *in all cases in which a search and seizure would be;* because it is a material ingredient, and affects the sole object and purpose of search and seizure.

(Emphasis supplied).

Early on, the Supreme Court began backing away from this conflating of the Fourth and the Fifth Amendments. *Adams v. New York,* 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904). In *Hale v. Henkel,* 201 U.S. 43, 72, 26 S.Ct. 370, 378, 50 L.Ed. 652 (1906), the Court observed:

Subsequent cases treat the 4th and 5th Amendments as quite distinct, having different histories, and performing separate functions.

The great master of evidence, John Henry Wigmore, was merciless in his criticism of this part of the *Boyd* opinion. He referred to it as a "dangerous heresy." With respect to the inappropriateness of *Boyd*'s even referring to the Fourth Amendment, he observed:

The Fourth Amendment, as pointed out in the concurring opinion by Miller, J., was of course not involved in the case. There was no search.

The Supreme Court has to a large extent recanted that part of the *Boyd* dicta which would apply the Fourth Amendment to an order to produce a document, properly a Fifth Amendment concern.

. . .

The fact is that there is *no* "intimate relation" between the Fourth and Fifth Amendments.

8 *Wigmore on Evidence* (McNaughton Rev.1961) § 2264 n. 4 (Emphasis in original).

After observing with respect to *Boyd* that "[t]he opinion [is] an unsatisfactory one," Dean Wigmore stressed the mutual exclusivity of the Fourth and Fifth Amendments:

*The opinion of the Court, however, asserted two fallacious conclusions:* First, that even though there was no search, "*compulsory production of private books and papers . . . is the equivalent of a search and seizure, and an unreasonable search and seizure, within the meaning of the Fourth Amendment." . . .*

It was not long before the Supreme Court largely repudiated the first fallacy, recanting that part of the *Boyd* opinion which would apply the Fourth Amendment to an order to produce a document, a matter properly in the Fifth Amendment's exclusive domain.

8 *Wigmore on Evidence* (McNaughton Rev.1961), § 2184a (Footnotes omitted; emphasis supplied).

The official obituary for *Boyd*'s "intimate relation" between the Fourth and Fifth Amendments came in 1976 with the cases of *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) and *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The *Fisher* opinion undercut *Boyd* in several different respects. With regard to *Boyd*'s commingling of the Fourth and Fifth Amendments, one academic commentator noted the effect of *Fisher:*

> The opinion of the Court, delivered by Justice White, began by formally recognizing the death of the doctrine of the "intimate relation" between the fourth and fifth amendments.

Comment, *The Life and Times of Boyd v. United States (1886–1976),* 76 Mich. L.Rev. 184, 207 (1977).

In *Andresen v. Maryland,* State investigators searched the private law office and the private business office of the defendant and seized incriminating personal records. The defendant sought, unsuccessfully, to invoke *Boyd*'s union of the two amendments. *Boyd* had held that the subpoenaing of incriminating documentary records was tantamount to a search for and seizures of such records. In *Andresen* there was an actual search for and seizure of such records. The Supreme Court, however, declined to follow earlier doctrine equating a search and seizure of personal papers with compelled self-incrimination:

> *He bases his argument,* naturally, *on dicta in a number of cases which imply, or state, that the search for and seizure of a person's private papers violate the privilege against self-incrimination.* Thus in *Boyd v. United States,* the Court said: "[W]e have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself."

> *We do not agree,* however, *that these broad statements compel suppression of this petitioner's business records as a violation of the Fifth Amendment.*

427 U.S. at 471–72, 96 S.Ct. at 2744 (Citations omitted; emphasis supplied).

In *Andresen,* the Supreme Court referred to the doctrinal erosion that had been taking place:

> In the very recent case of *Fisher v. United States.* [w]e recognized that *the continued validity of the broad statements contained in some of the Court's earlier cases* [19] *had been discredited by later opinions.* In those earlier cases, the legal predicate for the inadmissibility of the evidence seized was a violation of the Fourth Amendment.

427 U.S. at 472, 96 S.Ct. at 2744 (Emphasis supplied).

In severing the cord between the two amendments, the Supreme Court concluded that no matter how incriminating the personal records might be, no compulsion had been brought to bear on the person of the defendant, *compelling him* to be a *witness* against himself. The Fifth Amendment, therefore, was not implicated by the Fourth Amendment search and seizure:

> *[P]etitioner was not asked to say or to do anything.* ... *The search* for *and seizure* of those records *were conducted by law enforcement personnel.* ...
>
> *[A]lthough the Fifth Amendment may protect an individual from complying with a subpoena* for the production of his personal records in his possession because the very act of product may constitute a compulsory authentication of incriminating information, *a seizure of the same materials by law enforcement officers differs in a crucial respect*—the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence.

427 U.S. at 473–74, 96 S.Ct. at 2745 (Emphasis supplied).

If a formal obituary were required for *Boyd*'s "intimate relation" between the Fourth and Fifth Amendments, it was

---

**19.** In footnote 6, the Court referred to *Boyd v. United States* as the case that had illustrated the "convergence theory" of the Fourth and Fifth Amendments.

certainly delivered by *United States v. Leon,* 468 U.S. 897, 905–06, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984):

> *Language in opinions of this Court* and of individual Justices *has sometimes implied that the exclusionary rule . . . is required by the conjunction of the Fourth and Fifth Amendments.* These implications need not detain us long. *The Fifth Amendment theory has not withstood critical analysis or the test of time, and the Fourth Amendment* "*has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons.*"

(Emphasis supplied).

*Boyd*'s intimate relation between the Fourth and Fifth Amendments has suffered an apparently irreconcilable estrangement.

### B. *Boyd* 's Application of the Fifth Amendment Privilege

In addition to equating a subpoena for documentary evidence with a search and seizure, *Boyd* stood for two other closely related and very basic principles, both of which have also been repudiated in the last thirty years. After holding that a subpoena for documentary records was tantamount to a search and seizure, it was necessary for the *Boyd* Court further to find that such a search and seizure had been unreasonable in order to hold such evidence inadmissible. *Boyd* advanced two reasons for such a further finding.

The first was that compelling a suspect to produce incriminating personal papers or documentary records violated that suspect's Fifth Amendment privilege against compelled self-incrimination. *Boyd* first announced that the seizure of private books and papers constituted compelled self-incrimination within the contemplation of the Fifth Amendment:

> [W]e have been unable to perceive that *the seizure of a man's private books and papers to be used in evidence against him is* substantially different from *compelling him to be a witness against himself.* We think it is within the clear intent and meaning of those terms.

116 U.S. at 633, 6 S.Ct. at 534 (Emphasis supplied). *Boyd* then held that for that very reason, such a seizure was *ipso facto* unreasonable:

> [W]e are further of opinion that *a compulsory production of the private books and papers* of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and *is the equivalent of a search and seizure—and an unreasonable search and seizure—*within the meaning of the Fourth Amendment.

116 U.S. at 634–35, 6 S.Ct. at 534–35 (Emphasis supplied).

### 1. *Fifth Amendment Privilege Limited to Criminal Cases*

That particular holding of *Boyd* has suffered erosion in two separate regards. In holding that the privilege of not being compelled to incriminate oneself had applicability to a forfeiture proceeding, *Boyd* failed to circumscribe the scope of the Fifth Amendment privilege nearly as austerely as subsequent case law indisputably circumscribed it.

In *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), Bilokumsky was ordered deported from the country because of his commission of a criminal offense. The deportation was contingent upon the criminal offense. Notwithstanding the fact that the deportation proceeding was certainly as "quasi criminal" as would have been a forfeiture proceeding, the Supreme Court held that because the deportation proceeding itself was not criminal, the Fifth Amendment privilege against compelled self-incrimination did not apply. In proving the necessary fact of alienage, the government used, and the hearing officer relied on, Bilokumsky's silence when confronted with the contention that he was an alien:

> To prove alienage the inspector called Bilokumsky as a witness. He was sworn, but, when questioned by the

immigration inspector, under advice of counsel, stood mute, refusing even to state his name.

263 U.S. at 152, 44 S.Ct. at 55.

It was Justice Brandeis who wrote for the Court as it held that there was no Fifth Amendment prohibition on the use of Bilokumsky's silence against him:

Silence is often evidence of the most persuasive character. . . .

[H]is failure to claim that he was a citizen and his refusal to testify on this subject had a tendency to prove that he was an alien.

... *[T]here is no rule of law which prohibits* officers charged with the administration of the immigration law from *drawing an inference from the silence of one who is called upon to speak. Deportation proceedings are civil in their nature.* ... There is no provision which forbids drawing an adverse inference from the fact of standing mute.... *Since the proceeding was not a criminal one, Bilokumsky might have been compelled by legal process to testify whether or not he was an alien.*

263 U.S. at 153–55, 44 S.Ct. at 56 (Emphasis supplied).

Whatever vitality there might once have been in *Boyd*'s notion that characterizing a proceeding as "quasi criminal" *ipso facto* brings it under the umbrella of those constitutional protections available for truly criminal proceedings could hardly have survived *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). It is difficult to conceive of an ostensibly civil proceeding that could be any more "quasi criminal" in nature than the one involved in that case. It was certainly more criminal in character than a forfeiture proceeding. Palmigiano, serving a life sentence for murder in a Rhode Island prison, was charged by the prison officials with inciting a disturbance and with disrupting prison operations, two acts which could have been presented as state crimes. Following a hearing, at which his silence was used as evidence against him, he was placed in *"punitive segregation"* for thirty days.

Prior to his disciplinary hearing, Palmigiano was informed that he had a right to remain silent but that if he remained silent, his silence could and probably would be held against him. Palmigiano chose to remain silent. At the disciplinary hearing, "his silence was given [the] value [that] was warranted by the facts surrounding his case." With respect to the advisement that had been given him, the Supreme Court commented:

> The advice given inmates by the decision-makers is merely a realistic reflection of the evidentiary significance of the choice to remain silent.

425 U.S. at 318, 96 S.Ct. at 1558. After pointing out that a prison disciplinary proceeding is not a criminal case, the Supreme Court concluded:

> Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*"

*Id.* (Emphasis in original).

In *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), the Supreme Court was dealing with a situation where lessees of facilities in the area of the Arkansas River System were required, under the threat of fine or imprisonment for failing to do so, to report any discharge of oil into that river system. Under that compulsion to report, L.O. Ward reported a spillage of oil and was subjected to a civil penalty of $500. The law actually permitted civil citations of up to $5,000 for each such discharge of oil.

The United States Court of Appeals for the 10th Circuit reversed the citation, holding that the law was sufficiently punitive to engage the gears of the Fifth Amendment's privilege against compelled self-incrimination. The Supreme Court, in turn, reversed the 10th Circuit. Applying a test that *Boyd v. United States* had not even considered when it, *sua sponte,* declared the forfeiture before it to be "quasi criminal,"

the Supreme Court exhibited significant deference to legislative intent.

It noted but did not find dispositive the fact that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission." 448 U.S. at 250, 100 S.Ct. at 2642. The opinion of Justice Rehnquist recognized that the respondent was invoking the "quasi criminal" notion of *Boyd:*

Respondent asserts that, even if the penalty imposed upon him was not sufficiently criminal in nature to trigger other guarantees, it was "quasi-criminal," and therefore sufficient to implicate the Fifth Amendment's protection against compulsory self-incrimination. He relies primarily in this regard upon *Boyd v. United States* and later cases quoting its language.

448 U.S. at 251, 100 S.Ct. at 2642 (Citation omitted). The Supreme Court declined to give *Boyd* a broad reading:

Read broadly, *Boyd* might control the present case. This Court has declined, however, to give full scope to the reasoning and dicta in *Boyd,* noting on at least one occasion that "[s]everal of *Boyd*'s express or implied declarations have not stood the test of time."

448 U.S. at 253, 100 S.Ct. at 2643. In holding that the proceeding in question was not criminal in nature and that the Fifth Amendment privilege, therefore, did not apply, the Supreme Court relied primarily on legislative intent:

[I]n the light of what we have found to be overwhelming evidence that Congress intended to create a penalty civil in all respects and quite weak evidence of any countervailing punitive purpose or effect it would be quite anomalous to hold that § 311(b)(6) created a criminal penalty for the purposes of the Self–Incrimination Clause but a civil penalty for all other purposes. We do not read *Boyd* as requiring a contrary conclusion.

448 U.S. at 254, 100 S.Ct. at 2644.

In *Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), the petitioner was institutionalized indefinitely under the Illinois Sexually Dangerous Persons Act. The provi-

sions of the Act did not apply to all persons who might qualify as being sexually dangerous. They applied only to those who had actually committed criminal acts of sexual assault. Under the Act, the petitioner was required to be interviewed by two State psychiatrists. He was subsequently found to be a sexually dangerous person and institutionalized largely on the testimony of those psychiatrists.

The petitioner claimed that the sexually-dangerous-person proceeding was itself "criminal" and that his Fifth Amendment privilege against compelled self-incrimination had, therefore, been violated. The Supreme Court held that the proceeding was not criminal in nature and that the privilege did not apply. Once again, it indicated that the resolution of the civil-criminal question was largely to be determined by legislative intent:

> *The question* whether a particular proceeding is criminal for the purposes of the Self–Incrimination Clause *is first of all a question of statutory construction.* ... As petitioner correctly points out, however, the civil label is not always dispositive. Where a defendant has provided "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" that the proceeding be civil, it must be considered criminal and the privilege against self-incrimination must be applied. We think that petitioner has failed to provide such proof in this case.

478 U.S. at 368–69, 106 S.Ct. at 2992 (Citations omitted; emphasis supplied).

Certain judicial proceedings obviously possess both civil and criminal characteristics. One hundred twelve years ago, the Supreme Court was content in *Boyd* to place the label "quasi criminal" on certain mixed proceedings and to rule that in such a situation the Fifth Amendment privilege against compelled self-incrimination would apply. Over the course of recent decades, however, the Court no longer presumes to make such a judgment *sua sponte* but instead defers to legislative intent on the question of whether a given proceeding shall be deemed civil or criminal. Only in extreme circum-

stances will the Court override or "trump" that legislative determination. If, relying largely on the legislative intent, the proceeding is deemed to be substantially civil notwithstanding its mixed quality, the Fifth Amendment privilege will not be applied.

### 2. Personal Papers and Documentary Records No Longer Enjoy a Fifth Amendment Privilege

Quite aside from the question of whether the adverse or incriminating evidence is being used in a criminal case (something forbidden by the Fifth Amendment privilege) or in a civil case (something as to which the Fifth Amendment privilege is indifferent), *Boyd*'s Fifth Amendment reasoning has been eroded away in yet another respect. *Boyd* had held that no matter how meticulously correct the investigative or summonsing procedures may have been, an individual's personal documentary records enjoyed absolute immunity from being offered in court against that individual.

The reasons for that immunity were two-fold. One was based on *Boyd*'s articulation of what came to be known as the "mere evidence rule," the subject of a separate erosion to be explored in the next subsection. The reasoning behind that theory of immunity was that the government could not assert any proprietary interest in "mere evidence" and could not, therefore, seize it from its rightful owner. A second line of reasoning supporting the immunity enjoyed by documentary evidence was that using an individual's writings or personal records to incriminate him was a form of compulsory self-incrimination expressly forbidden by the Fifth Amendment privilege.

> The *Boyd* opinion itself was very emphatic in this regard: [A]ny forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment.

116 U.S. at 630, 6 S.Ct. at 532.

> [W]e have been unable to perceive that the seizure of a man's private books and papers to be used in evidence

against him is substantially different from compelling him to be a witness against himself.

116 U.S. at 633, 6 S.Ct. at 534.

[W]e are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment.

116 U.S. at 634–35, 6 S.Ct. at 534.

Although that view of the testimonial character of personal papers and documents would not be formally abandoned for almost ninety years after its first articulation in *Boyd*, distant rumblings were heard as early as 1927. In *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), personal books and papers, indistinguishable from those afforded protection in *Boyd*, were used against Marron with Supreme Court approval. The circumstances, if anything, were far harsher than in *Boyd*. The records were seized not pursuant to a judicially-issued *subpoena duces tecum* but in a warrantless search and seizure in the course of a police raid. The records were used, moreover, not in a peripheral forfeiture proceeding but in a direct criminal prosecution. The Supreme Court was able to avoid the "mere evidence rule" by declaring that the records were actually an *instrumentality* for conducting a bootlegging operation, thereby giving the government a superior proprietary claim. The Court did not touch directly the applicability of the Fifth Amendment privilege *per se.*

The handwriting on the wall for the subsequent removal of personal papers and records from the protection of the Fifth Amendment privilege could well have been discerned in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Although that case did not involve papers or records but, rather, the taking of a blood sample from a suspect, the opinion of Justice Brennan in *Schmerber* emphatically established that the Fifth Amendment is not a broad right against all compelled self-incrimination but a limited privilege against being compelled to be a *witness* against

oneself. It is a privilege only against compelled *testimonial* self-incrimination. Unless, therefore, the incriminating evidence that is being compelled can be deemed communicative or testimonial in character, it enjoys no Fifth Amendment protection:

> The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.

384 U.S. at 764, 86 S.Ct. at 1832.

It was *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), that sounded the death knell for *Boyd*'s holding that the contents of personal documentary records enjoy the protection of the Fifth Amendment privilege. The stage for the *Fisher* holding, however, was first set by *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). At stake in *Couch* were taxpayer records that potentially incriminated the petitioner Lillian Couch. A *subpoena duces tecum* for the records was served on Mrs. Couch's accountant. In rejecting her Fifth Amendment claim, the Supreme Court emphasized that the "privilege is a personal one: it adheres basically to the person, not to information that may incriminate him." 409 U.S. at 328, 93 S.Ct. at 616. The Court emphasized that the heart of the Fifth Amendment protection is that it guards against *compulsion* brought to bear on the person enjoying the privilege. The privilege did not apply to Mrs. Couch because no compulsion was brought to bear on her. The compulsion, to wit, the threat of contempt for non-compliance with the court order, was brought to bear only on her accountant.

In the *Fisher* case, the potentially incriminating records in question were in the hands of Fisher's attorney and the subpoena was served on the attorney. Under the clear authority of *Couch,* there was no direct violation of the Fifth Amendment privilege of Fisher because the compulsion was brought to bear not upon him but upon his attorney. *Fisher,*

however, went on to claim a different protection based on the Sixth Amendment right to counsel and its related attorney-client privilege.

To resolve that question, the Supreme Court had to ask and answer a hypothetical Fifth Amendment question. If Fisher could not have been compelled to respond to the *subpoena duces tecum* for his records had they been in his direct possession, then they would similarly be protected, under the attorney-client privilege, when in his attorney's possession. If, on the other hand, Fisher could have been compelled to produce the records had they been in his possession, then those records would not have acquired a greater protection simply because they had been transferred from him to his attorney.

> This Court and the lower courts have thus uniformly held that *pre-existing documents which could have been obtained by court process from the client* when he was in possession *may also be obtained from the attorney* by similar process following transfer by the client in order to obtain more informed legal advice.

425 U.S. at 403–04, 96 S.Ct. at 1577 (Emphasis supplied). The question, albeit hypothetical, was clear:

> We accordingly proceed to the question whether the documents could have been obtained by summons addressed to the taxpayer while the documents were in his possession.

425 U.S. at 405, 96 S.Ct. at 1578.

In response to the hypothetical question, the Supreme Court held that an individual is not privileged to withhold incriminating personal papers, records, and documents even when they are in his direct possession. The Court's reasoning was that for the privilege to apply, there must be, *inter alia,* both the element of compulsion and the testimonial element and that those elements must coincide in time. When an individual compiles or writes out his own records or documents (including, theoretically, the confiding of his thoughts to his diary), he may well be doing a testimonial act. Such an act, however, at that time is a purely voluntary one rather

than something compelled. When at some later time he is compelled to produce those writings, he is not being compelled to do something which is then testimonial but only to produce a thing, a written artifact. It is no different than if he were required to produce a gun or a suit of clothing.

The Supreme Court acknowledged that *Boyd* would have dictated an opposite result. It summarized the *Boyd* holding in that regard:

> The Court went on to hold that the accused in a criminal case or the defendant in a forfeiture action could not be forced to produce evidentiary items without violating the Fifth Amendment ... More specifically, the Court declared, "a compulsory production of the private books and papers of the owner of goods sought to be forfeited ... is compelling him to be a witness against himself within the meaning of the Fifth Amendment."

425 U.S. at 406–07, 96 S.Ct. at 1579.

After declaring that "[s]everal of *Boyd*'s express or implicit declarations have not stood the test of time," the Supreme Court held squarely that, contrary to *Boyd,* the compelled production of incriminating evidence is not unconstitutional unless the evidence compelled is actually testimonial:

> It is also clear that the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a Testimonial Communication that is incriminating.

425 U.S. at 408, 96 S.Ct. at 1579. The Supreme Court went on to indicate that the *Boyd* rationale no longer had any viability:

> To the extent ... that the rule against compelling production of private papers rested on the proposition that seizures of or subpoenas for "mere evidence," including documents, violated the Fourth Amendment and therefore also transgressed the Fifth ... *the foundations for the rule have been washed away.* In consequence, *the prohibition against forcing the production of private papers has long been a rule searching for a rationale* consistent with the proscrip-

tions of the Fifth Amendment against compelling a person to give "testimony" that incriminates him.

425 U.S. at 409, 96 S.Ct. at 1580 (Emphasis supplied).

The holding of *Fisher* is the diametric opposite of what *Boyd* had held ninety years before:

[T]he Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects a person only against being incriminated by his own compelled testimonial communications.... T*he taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing,* whether his own or that of someone else.

425 U.S. at 409–10, 96 S.Ct. at 1580–81 (Emphasis supplied).

In *United States v. Doe,* 465 U.S. 605, 610–11, 104 S.Ct. 1237, 1241, 79 L.Ed.2d 552 (1984), the Supreme Court reconfirmed its holding in *Fisher* that the Fifth Amendment privilege is not involved unless the element of compulsion and the testimonial element coincide in time:

[T]he Fifth Amendment only protects the person asserting the privilege from *compelled* self-incrimination Where the preparation of business records is voluntary, no compulsion is present. A subpoena that demands production of documents "does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought."

(Emphasis in original; citation and footnote omitted).

Justice O'Connor explained the current state of the law with unmistakable clarity:

[T]he Fifth Amendment provides absolutely no protection for the contents of private papers of any kind.

*United States v. Doe,* 465 U.S. 605, 618, 104 S.Ct. 1237, 1245, 79 L.Ed.2d 552 (1984) (concurring opinion by O'Connor, J.)

## C. The Repudiation of *Boyd*'s "Mere Evidence Rule"

The central support beam for *Boyd v. United States* was the "mere evidence rule." That doctrinal undergirding was completely dismantled by the Supreme Court in 1967.

After equating the *subpoena duces tecum* for private books and records with a search for and seizure of such books and records, *Boyd* had held that such a search and seizure was unreasonable for an additional reason other than the Fifth Amendment compulsion discussed above. The books and records were, aside from any other consideration, the *private property* of the Boyd brothers and, therefore, could not be taken from them by any conceivable procedure or court order.

*Boyd* quoted with approval Lord Camden in the historic case of *Entick v. Carrington*, 19 Howell's State Trials 1029 (1765):

> *Papers are the owner's goods and chattels; they are his dearest property;* and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away the secret nature of those goods will be an aggravation of the trespass ... Where is the written law that gives any magistrate such a power? I can safely answer, there is none.

116 U.S. at 627–28, 6 S.Ct. at 531 (Emphasis supplied).

That was the first American recognition of what came to be known as the "mere evidence rule," an incredible doctrine to the modern mind that would reach its high water mark in *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). That doctrine was the product of the 18th and 19th Century political philosophy that the right of property was superior to all other rights. It was articulately stated in *Boyd*'s quotation from *Entick v. Carrington*:

> *The great end for which men entered into society was to secure their property. That right is preserved sacred* and incommunicable in all instances where it has not been taken

away or abridged by some public law for the good of the whole.

116 U.S. at 627, 6 S.Ct. at 530 (Emphasis supplied).

There were only several limited ways in which that "sacred" right of property could be "taken away or abridged" so that the property could, coincidentally, be used as evidence. The first concerned stolen goods or what was then generally referred to as the "fruits of crime." The true owner, of course, had a superior property right to that of the thief. The State, in obtaining a warrant for the stolen goods (the first type of warrant countenanced by the common law), was simply acting as the replevin agent of the true owner and, as such, also enjoyed the owner's superior property right. *Boyd* contrasted such a permitted seizure with the forbidden seizure of personal property over which the government could not assert a superior property interest:

> *The search for and seizure of stolen or forfeited goods,* or goods liable to duties and concealed to avoid the payment thereof, *are totally different things from a search for and seizure of a man's private books and papers for the purpose of* obtaining information therein contained, or of *using them as evidence* against him. . . . *In the one case, the government is entitled to the possession of the property; in the other it is not.* The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government.

116 U.S. at 623, 6 S.Ct. at 528 (Footnote omitted; emphasis supplied).

A second category of property over which the State could establish a superior property right was contraband, such as forbidden firearms, untaxed whiskey, or narcotic drugs. The law forbids a private citizen to own or possess contraband.

The citizen, therefore, cannot assert a defensive property claim when the government seizes contraband:

> So, also, the laws which provide for the search and seizure of articles and things which it is unlawful for a person to have in his possession for the purpose of issue or disposition, such as counterfeit coin, lottery tickets, implements of gambling, etc., are not within this category. Many other things of this character might be enumerated.

116 U.S. at 624, 6 S.Ct. at 529 (Citation omitted).

The last of the categories as to which the State developed a superior property theory so as to justify a seizure was for "instrumentalities of crime." That theory was based on the old common law concept of deodands. (*Deo dandum:* "It shall be given to God.") Any inanimate object that had been an instrumentality by which a crime was committed was subject to forfeiture (initially to God; after 1536, to the King; and after 1776, to the state).

If, however, property, such as the books and records of the Boyd brothers, could not be characterized as stolen goods, contraband, or instrumentalities but only as "mere evidence," the State could assert no superior property right and, therefore, could not seize it by any conceivable procedure. The protection afforded such private property was not a procedural protection and did not involve due process. It was, rather, the notion that personal property in which the government could not assert a superior property interest enjoyed an absolute immunity from search or seizure or use as evidence. As one academic commentator characterized *Boyd*'s position in that regard:

> Justice Bradley concluded that *the owner's "indefeasible" natural law property rights,* enshrined in the common law and protected by the reasonableness clause of the fourth amendment, *placed his private papers and other property absolutely beyond the reach of government agents seeking evidence of crime.*

Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments,* 90

Harv. L.Rev. 945, 953 (1977) (Emphasis supplied). For that reason, the seizure of the books in *Boyd* was deemed unreasonable.

The "mere evidence rule" reached its apogee in *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). A conviction was there reversed because the government had seized and used at trial private papers that were "mere evidence." *Gouled* built on *Boyd* and held:

> [I]t is clear that, at common law and as the result of the *Boyd* and *Weeks* Cases ... *[search warrants] may not be used* as a means of gaining access to a man's house or office and papers *solely for the purpose* of making search *to secure evidence* to be used against him in a criminal or penal proceeding, but that *they may be resorted to only when a primary right* to such search and seizure *may be found in the interest which the public* or the complainant *may have in the property* to be seized, or in the right to the possession of it, or when a valid exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken. *Boyd* Case.

255 U.S. at 309, 41 S.Ct. at 265 (Citation omitted; emphasis supplied).

That 19th Century zeitgeist of property as "the great end for which man entered into society" was at last exorcized by *Warden of Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).[20] Justice Brennan's opinion stated the broad issue before the Court:

> We review in this case *the validity of the proposition that there is under the Fourth Amendment a "distinction between merely evidentiary materials,* on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, *and* on the other hand, *those objects which may validly be seized* including the instrumentalities and means by which a

---

**20.** *Warden v. Hayden* is also, coincidentally, the case in which the Supreme Court first recognized the "hot pursuit" or "exigent circumstances" exception to the Fourth Amendment's warrant requirement.

crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime."

387 U.S. at 295–96, 87 S.Ct. at 1644 (Footnote omitted; emphasis supplied).

In a Baltimore City trial for armed robbery, the State had introduced a cap, a jacket, and trousers belonging to the defendant. On federal *habeas corpus* review, the Fourth Circuit reversed Hayden's conviction, *Hayden v. Warden*, 363 F.2d 647 (4th Cir.1966), relying on the "mere evidence rule." After recognizing that the Fourth Circuit had felt bound by the rule, the Supreme Court expressly rejected it:

> The distinction made by some of our cases between seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband has been criticized by courts and commentators. The Court of Appeals, however, felt "obligated to adhere to it." 363 F.2d at 655. *We today reject the distinction as based on premises no longer accepted as rules governing the application of the Fourth Amendment.*

387 U.S. at 300–01, 87 S.Ct. at 1646–47 (Footnotes omitted; emphasis supplied).

After noting that "[n]othing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband," the Supreme Court traced the "mere evidence rule" through *Gouled* to *Boyd*:

> In *Gouled v. United States*, the Court said that search warrants "may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding...." The Court derived from *Boyd v. United States* ... the proposition that warrants "may be resorted to only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or when a valid

exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken," that is, when the property is an instrumentality or fruit of crime, or contraband.

387 U.S. at 302, 87 S.Ct. at 1647–48 (Citations omitted).

Justice Brennan's opinion recognized that *Boyd v. United States* and the "mere evidence rule" were thoroughly grounded in the 19th Century's veneration of the right of property:

> The common law of search and seizure after *Entick v. Carrington* reflected Lord Camden's view, derived no doubt from the political thought of his time, that the "great end, for which men entered into society, was to secure their property." Warrants were "allowed only where the primary right to such a search and seizure is in the interest which the public or complainant may have in the property seized."
>
> ... No separate governmental interest in seizing evidence to apprehend and convict criminals was recognized; it was required that some property interest be asserted.

387 U.S. at 303, 87 S.Ct. at 1648 (Citations omitted). *See also* Kaplan, *Search and Seizure: A No–Man's Land in the Criminal Law,* 49 Calif. L.Rev. 474, 475 (1961); Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937), 133–34; Landynski, *Search and Seizure and the Supreme Court* (1966); Comment, *The Life and Times of Boyd v. United States (1886–1976),* 76 Mich. L.Rev. 184 (1977).

By 1967, however, there had been a seismic upheaval in the Fourth Amendment substructure. Privacy, not property, became the touchstone. The diametric difference in outlook between the late 19th Century and the late 20th Century—between *Boyd v. United States* and *Warden v. Hayden*—was the perception of the core value being protected by the Fourth Amendment as an interest in privacy rather than an interest in property:

> *The premise that property interests control* the right of the Government to search and seize *has been discredited.* ... We have recognized that *the principal object of the*

*Fourth Amendment is the protection of privacy rather than property,* and have increasingly discarded fictional and procedural barriers rested on property concepts.[21]

387 U.S. at 304, 87 S.Ct. at 1648 (Emphasis supplied).

In rejecting, as well, the so-called "intimate relation" between the Fourth and Fifth Amendments, *Warden v. Hayden* also dismissed the defendant's claim based on the privilege against compelled testimonial self-incrimination:

> The items of clothing involved in this case are not "testimonial" or "communicative" in nature, and their introduction therefore did not compel respondent to become a witness against himself in violation of the Fifth Amendment.

387 U.S. at 302–03, 87 S.Ct. at 1648.

Both this Court and the Court of Appeals have recognized the prior existence and the demise of the "mere evidence rule." *In re Special Investigation No. 228,* 54 Md.App. 149, 170–74, 458 A.2d 820 (1983); *State v. Intercontinental, Ltd.,* 302 Md. 132, 138–40, 486 A.2d 174 (1985). *Special Investigation No. 228* described how the rule had operated:

> Until the promulgation of *Warden v. Hayden* (1967), the right of the State to seek and to use evidence was strictly contingent on its ability to establish a superior property right in the evidence. Under the long prevailing "mere evidence rule," the State was entitled to search for, to seize, and to use (1) the fruits of crime (stolen goods), (2) instrumentalities of crime, and (3) contraband, because the State was able to establish a property right in such evidence superior to that of the defendant. *The State could not seize*

---

**21.** See Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments,* 90 Harv. L.Rev. 945, 969–70 (1977):

The Supreme Court finally abandoned the mere-evidence rule in 1967 with *Warden v. Hayden* ... Justice Brennan explicitly substituted a "privacy" orientation for the fourth amendment in place of *Boyd*'s "discredited" property rationale.
(Footnotes omitted).

*and use, on the other hand, "mere evidence" of crime, even under a constitutionally unassailable search warrant, because there was no known theory under which it could assert a superior property right.*

54 Md.App. at 170, 458 A.2d 820 (Citation and footnote omitted; emphasis supplied).

We recognized that the "whole theory of the entitlement of the State to seize, to retain, and to use personal property that has utility as evidence of crime changed drastically" as *Warden v. Hayden* "squarely abolished the 'mere evidence rule' and recognized that whatever historical validity the old property theories might once have had, they were totally obsolete." 54 Md.App. at 172, 458 A.2d 820.

The new dispensation was clear:

What emerges is the governmental policy that ... the State derives its entitlement to seize, to hold, and to use personal property from the very utility of that property as evidence of crime. *Utility as evidence is all the justification the State needs to assert control over the property.* Stolen goods are seized primarily to prove larceny, not to recover the chattels for the victim. Contraband is seized primarily to prove unlawful possession, not to destroy it. The instrumentality of death is seized primarily to prove the murder, not to forfeit it to God, King, or State. With the new analysis, *all evidence,* including what had once been "mere evidence," *is controllable by the State simply by virtue of its evidentiary utility.*

54 Md.App. at 173–74, 458 A.2d 820 (Emphasis supplied). In *State v. Intercontinental, Ltd.,* Chief Judge Murphy observed:

Maryland law no longer restricts the type of property which is subject to seizure. We have adopted the *Warden v. Hayden* formulation that fruits or instrumentalities of a crime, contraband, or mere evidence is property subject to seizure under the law of Maryland. *See State v. Boone,* 284

Md. 1, 11, 393 A.2d 1361 (1978); *State v. Wilson*, 279 Md. 189, 196, 367 A.2d 1223 (1977).

302 Md. at 140, n. 4, 486 A.2d 174.

### D. The Literal *Boyd* Decision Itself Has Been Implicitly Overruled

Not only have the broad doctrinal pronouncements of *Boyd*, which dominated American jurisprudence for three quarters of a century, been completely repudiated one by one, but the narrow and literal decision in the *Boyd* case itself has been implicitly overruled by *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). The *Boyd* decision itself is completely vague as to precisely who or what the party was that claimed the constitutional violation.[22] The thirty-five cases of plate glass that were the subject of the forfeiture proceeding were the property of a partnership, E.A. Boyd and Sons. The invoice for twenty-nine other cases of plate glass, which was the subject of the *subpoena duces tecum*, was a business record of the partnership, E.A. Boyd and Sons. The "claimants" were presumably the two Boyd brothers, who were the two partners of E.A. Boyd and Sons.

Under the "collective entity" rule, it is now clear that the partnership, the owner of the goods subject to forfeiture in *Boyd*, had no Fifth Amendment privilege to assert. It is equally clear that the partners themselves were not privileged to withhold the partnership's records.

The development of the "collective entity" rule and the corresponding erosion of *Boyd* began with *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). That case held that a corporation enjoyed no Fifth Amendment protection. The effect of *Hale v. Henkel* was described in *Braswell v. United States*, 487 U.S. 99, 105, 108 S.Ct. 2284, 2288, 101 L.Ed.2d 98 (1988):

---

**22.** The summary of the *Boyd* decision in *Fisher v. United States*, 425 U.S. 391, 405–07, 96 S.Ct. 1569, 1578–79, 48 L.Ed.2d 39 (1976), is more enlightening in this regard than the *Boyd* opinion itself.

The ruling in *Hale* represented a limitation on the prior holding in *Boyd v. United States*, which involved a court order directing partners to produce an invoice received by the partnership. The partners had produced the invoice, but steadfastly maintained that the court order ran afoul of the Fifth Amendment. This Court agreed. . . . [T]he Court declared: "[A] compulsory production of the *private* books and papers of the owner of goods sought to be forfeited . . . is compelling him to be a witness against himself, within the meaning of the Fifth Amendment." *Hale* carved an exception out of *Boyd* by establishing that corporate books and records are not "private papers" protected by the Fifth Amendment.

The "collective entity" exemption from Fifth Amendment protection grew steadily during the years from 1906 through 1974. *See, e.g., Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *Dreier v. United States*, 221 U.S. 394, 31 S.Ct. 550, 55 L.Ed. 784 (1911); and *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

*Bellis* made it clear for the first time that partnerships, large or small, were included within the "collective entity" exemption from Fifth Amendment coverage. It reiterated the basic principle that the Fifth Amendment privilege is available only for natural persons and not for artificial entities such as partnerships:

These decisions reflect the Court's constant view that the privilege against compulsory self-incrimination should be "limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records."

417 U.S. at 89–90, 94 S.Ct. at 2184. *Bellis* also made it clear that an individual partner may not assert his own Fifth Amendment privilege in order to avoid producing the partnership books or records when they are the subject of a court order:

[A]n individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his

possession in a representative capacity, even if these records might incriminate him personally.

417 U.S. at 88, 94 S.Ct. at 2183.

*Braswell v. United States,* 487 U.S. at 108–09, 108 S.Ct. at 2290, explained the impact of *Bellis:*

The plain mandate of these decisions is that without regard to whether the subpoena is addressed to the corporation, or as here, to the individual in his capacity as a custodian, see ... *Bellis, supra,* a corporate custodian such as petitioner may not resist a subpoena for corporate records on Fifth Amendment grounds.

It is now clear that neither E.A. Boyd and Sons, the partnership, nor the two Boyd brothers, as partners, enjoyed in the first place a Fifth Amendment right that could have been violated. As to what would happen, therefore, to the *Boyd* case today, were it before the Supreme Court as of first impression, *Fisher v. United States,* 425 U.S. at 408, 96 S.Ct. at 1580, was very clear:

[D]espite *Boyd,* neither a partnership nor the individual partners are shielded from compelled production of partnership records on self-incrimination grounds. *Bellis v. United States.* It would appear that under that case the precise claim sustained in *Boyd* would now be rejected for reasons not there considered.

(Citation omitted).

## D. *Boyd v. United States: The Final Requiem*

Our reason for such an exhaustive, and exhausting, examination of *Boyd v. United States* is that *One 1958 Plymouth Sedan* so totally relied on *Boyd* rather than engaging in any independent analysis of its own that its vitality self-evidently depends on the continuing vitality or now recognized morbidity of *Boyd. One 1958 Plymouth Sedan* never independently decided that a forfeiture proceeding was an appropriate venue for the Exclusionary Rule. It simply operated on the assumption that *Boyd* had already made such a decision, which, of course, *Boyd* had not.

The post-mortem of *Boyd* is an imposing task because the opinion dominated both Fourth Amendment analysis and Fifth Amendment analysis for almost a century. *Boyd* was so hydra-headed in its pronouncements, moreover, that its repudiation has necessarily been sufficiently fragmented as to leave its total repudiation in doubt unless all of the partial repudiations can be collected in a single place. It is our effort to do this that is our excuse for the inordinate length of our opinion.

As of *Andresen* in 1976 and *Leon* in 1984, *Boyd*'s "intimate relation" between the Fourth and Fifth Amendments had been totally repudiated. As of *Fisher* in 1976, *Boyd*'s notion that the forced production of personal records and documents violated the Fifth Amendment privilege had been totally repudiated. As of *Warden v. Hayden* in 1967, *Boyd*'s "mere evidence rule" had been totally repudiated. As of *Bellis v. United States* in 1974, moreover, it was clear that even a narrow decision on the literal facts of the *Boyd* case itself would have been the exact opposite of what *Boyd* decided in 1886.[23] It will also be noted that each of these rejections of *Boyd* came after *One 1958 Plymouth Sedan* had been decided in 1965.

---

**23.** Ironically, the one Supreme Court decision on which *Boyd* relied was *Coffey v. United States*, 116 U.S. 436, 6 S.Ct. 437, 29 L.Ed. 684 (1886). The erosion of *Coffey*, on the very proposition for which it was cited by *Boyd*, began in *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938). The complete and final disapproval came with *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984):

Whatever the validity of *Coffey* on its facts, *its ambiguous reasoning seems to have been a source of confusion for some time.* As long ago as *Mitchell*, this Court was urged to disapprove *Coffey* so as to make clear that an acquittal in a criminal trial does not bar a civil action for forfeiture even though based on the identical facts. *Indeed, for nearly a century, the analytical underpinnings of Coffey have been recognized as less than adequate.* The time has come to clarify that neither collateral estoppel nor double jeopardy bars a civil, remedial forfeiture proceeding initiated following an acquittal on related criminal charges. *To the extent that Coffey v. United States suggests otherwise, it is hereby disapproved.*

(Emphasis supplied). *See also Payne v. Tennessee*, 501 U.S. 808, 828 n. 1, 111 S.Ct. 2597, 2610 n. 1, 115 L.Ed.2d 720 (1991).

The closest the Supreme Court has come to a single official obituary for *Boyd* was the concurring opinion of Justice O'Connor in *United States v. Doe,* 465 U.S. 605, 618, 104 S.Ct. 1237, 1245, 79 L.Ed.2d 552, 563–64 (1984):

> I write separately . . . just to make explicit what is implicit in the analysis of that opinion: that the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind. The notion that the Fifth Amendment protects the privacy of papers originated in *Boyd v. United States* (1886), but our decision in *Fisher v. United States* (1976), sounded the death knell for *Boyd.* "Several of *Boyd*'s express or implicit declamations [had] not stood the test of time," and its privacy of papers concept "ha[d] long been a rule searching for a rationale. . . ." Today's decision puts a long overdue end to that fruitless search.

(Citations omitted). The academic commentators have been, if anything, more definitive in writing *Boyd*'s epitaph. "In the last two decades, the Court has so seriously eroded both the holding and the reasoning of *Boyd* that nothing may remain of either." [24] "*Boyd* in all of its aspects has been overruled." [25] "*Boyd* is dead." [26]

It is clear that nothing remains of *Boyd* except the poetry of Justice Bradley's expression. It is only because of that poetic resonance that echoes of *Boyd* still occasionally reverberate in unexpected places at unexpected times. All that remains, however, is the poetry and not the substance.

The inadaptability of *Boyd*'s fundamental political philosophy to the modern juridical world can best, perhaps, be illustrated by two examples of the bizarre results that would

**24.** Comment, *The Rights of Criminal Defendants and the Subpoena Duces Tecum: The Aftermath of Fisher v. United States,* 95 Harv. L.Rev. 683 (1982).

**25.** J.B. White, *Forgotten Points in the "Exclusionary Rule" Debate,* 81 Mich. L.Rev. 1273, 1283 (1983).

**26.** Comment, *The Life and Times of Boyd v. United States (1886–1976),* 76 Mich. L.Rev. 184, 212 (1977).

accrue if one even attempted to apply the *Boyd* decision itself, in its original 1886 rigor, to the situation before us in this case.

## 1. What Boyd Would Do That Would Not Today Be Done

Let us assume that the Baltimore police eschewed making a warrantless stop of Holmes's 1995 Corvette in this case. Let us assume that they, instead, slowly and surely developed unassailable probable cause that Holmes kept hidden in the glove compartment of the Corvette records of his narcotics transactions that showed indisputably 1) that the Corvette was regularly used for transporting narcotics and 2) that the Corvette had been purchased with the proceeds of earlier narcotics transactions. Supporting their application with sworn affidavits, the police obtained a judicially-issued search warrant for the glove compartment of the Corvette, particularly describing the records to be seized. Let us assume that they executed the search warrant in broad daylight in the presence of Holmes's attorney.

The *Boyd* holding, in its pristine 1886 form, would dictate that such records enjoyed an absolute immunity from seizure and could not be introduced in evidence, no matter how impeccable the police procedures that produced them might have been. In today's world, such a decision would be bizarre.

## 2. What Boyd Would Not Do That Could Today Be Done

Let us now apply the literal *Boyd* holding, in its pristine 1886 form, to the very facts we have before us in the present case. The documents and records that were protected by *Boyd* were protected, in major measure, because they were "mere evidence" rather than the fruits of crime, an instrumentality of crime, or contraband. The narcotics discovered by the Baltimore City police in this case, by dramatic contrast, was undisputed contraband and thus beyond the pale of *Boyd*'s protection. Even the 1995 Corvette itself, if its character were somehow pertinent, was an instrumentality of crime and thus also beyond the pale of *Boyd*'s protection. In today's world, such a decision would be bizarre.

The two illustrations demonstrate the foolhardiness of attempting to decide the propriety of the forfeiture of either the 1995 Corvette in this case or the 1958 Plymouth Sedan in 1965 on the basis of *Boyd v. United States,* a case which simply has no applicability to the modern world. The forfeitures in those two cases were predicated on the discovery, respectively, of contraband narcotics and contraband untaxed whiskey. Unlike the documentary evidence immunized from seizure by *Boyd,* contraband would not in that case have enjoyed any Fifth Amendment protection and would not have enjoyed the then-current immunity of the "mere evidence rule."

What does all of this portend for *One 1958 Plymouth Sedan?* As a syllogism worthy of precedential value, it is an empty shell. It is, at most, a dangling and invalid conclusion with no supporting premises. The decision of *One 1958 Plymouth Sedan* cannot be supported by principled argument, at least by none thus far enunciated. If it can be supported at all, it can only be by fiat: "It is because it says it is."

## IX.

### *The "Quasi Criminal" Characterization In One 1958 Plymouth Sedan Was Ad–Hoc*

But precisely what is it that *One 1958 Plymouth Sedan* says it is? Even if its holding were to be uncritically accepted as a fiat, *One 1958 Plymouth Sedan* still leaves us in a state of doubt as to precisely how broad or how narrow that holding actually is. The Court stated that the question before it was "whether the constitutional exclusionary rule enunciated in *Mapp* applies to forfeiture proceedings *of the character involved here.*" 380 U.S. at 696, 85 S.Ct. at 1248 (Emphasis supplied). It answered that the "exclusionary rule does apply to *such* forfeiture proceedings." *Id.* (Emphasis supplied). The "such" in the answer clearly has reference to the modifying phrase "of the character involved here" in the question. The ultimate issue is the extent to which the unquestionably modifying phrase "of the character involved here" limits the more generic category of "forfeiture proceedings."

As Justice Goldberg's opinion then embarked on its supporting analysis for its holding, however broad or narrow that might be, it quoted at length, and with approval, from *Boyd v. United States,* as *Boyd* explained why the forfeiture that it was considering was treated as something "quasi-criminal" in nature. The reliance of *One 1958 Plymouth Sedan* on *Boyd* was made clear by the first sentence that followed the quotation from *Boyd:* "This authoritative statement and the holding by the Court in *Boyd* . . . would seem to be dispositive of this case." 380 U.S. at 698, 85 S.Ct. at 1249. It went on to add, "[T]he basic holding of *Boyd* applies with equal, if not greater, force to the case before us." *Id.*

That portion of the *Boyd* opinion relied on by *One 1958 Plymouth Sedan* pointed out that the forfeiture, along with imprisonment and a fine, was simply one of the available sanctions spelled out in the very statutory provision that created the crime:

We are also clearly of opinion that *proceedings instituted for* the purpose of declaring *the forfeiture of a man's property* by reason of offenses committed by him, *though they may be civil in form, are in their nature criminal.* In this very case the ground of forfeiture . . . consists of certain acts of fraud committed against the public revenue in relation to imported merchandise, which are made criminal by the statute; and it is declared, that the offender shall be fined not exceeding $5,000, nor less than $50, or be imprisoned not exceeding two years, or both; and in addition to such fine such merchandise shall be forfeited. *These are the penalties affixed to the criminal acts, the forfeiture sought by this suit being one of them.* If an indictment had been presented against the claimants, upon conviction the forfeiture of the goods could have been included in the judgment. . . . *The information, though technically a civil proceeding, is in substance and effect a criminal one.*

As, therefore, *suits for penalties and forfeitures* incurred by the commission of offenses against the law, *are of this quasi criminal nature,* we think that they are within the

reason of criminal proceedings for all the purposes of the fourth amendment of the constitution.

380 U.S. at 697–98, 85 S.Ct. at 1249 (Emphasis supplied), quoting from *Boyd v. United States,* 116 U.S. at 633–34, 6 S.Ct. at 534.

The significance of "the character [of the forfeiture] involved [t]here" became clear in *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). The issue in *Ward* was whether a provision of the Federal Water Pollution Control Act permitting the imposition of a "civil penalty" of up to $5,000 for each violation of the Act was sufficiently criminal to engage the gears of the privilege against compelled self-incrimination. The United States Court of Appeals for the 10th Circuit had ruled that such a provision "was sufficiently punitive to intrude upon the Fifth Amendment's protections." 448 U.S. at 247–48, 100 S.Ct. at 2641. The Supreme Court reversed, holding that "the question whether a particular statutorily-defined penalty is civil or criminal is a matter of statutory construction" and that the legislative purpose will only be overridden by the courts when "the statutory scheme [is] so punitive either in purpose or effect as to negate that intention." 448 U.S. at 248–49, 100 S.Ct. at 2641.

The respondent in that case argued that the penalty imposed was "quasi-criminal" and "relie[d] primarily in this regard upon *Boyd v. United States* and later cases quoting its language." 448 U.S. at 251, 100 S.Ct. at 2642. The Supreme Court pointed out that "[r]ead broadly, *Boyd* might control the present case. This Court has declined, however, to give full scope to the reasoning and dicta in *Boyd.*" 448 U.S. at 253, 100 S.Ct. at 2643. The *Ward* Court then compared the loose relationship between the civil sanction and the underlying criminal offense there before it with the inextricably close relationship between the forfeiture sanction and the underlying criminal offense in the *Boyd* case itself and found the difference to be dispositive:

Moreover, the statute under scrutiny in *Boyd* listed forfeiture along with fine and imprisonment as one possible

punishment for customs fraud, a fact of some significance to the *Boyd* Court. Here, as previously stated, the civil remedy and the criminal remedy are contained in separate statutes enacted 70 years apart.

448 U.S. at 254, 100 S.Ct. at 2644 (Citation omitted). Indeed, *Boyd* itself had expressly noted the symbiotic relationship among its sanctions:

These are the penalties affixed to the criminal acts; the forfeiture sought by this suit being one of them. If an indictment had been presented against the claimants, upon conviction the forfeiture of the goods could have been included in the judgment.

116 U.S. at 634, 6 S.Ct. at 534. Immediately before stating that forfeitures "are of this quasi-criminal nature," *Boyd* had specifically referred to "the close relation between the *civil and criminal proceedings on the same statute.*" *Id.* (Emphasis supplied).

In this regard we note that the forfeiture proceeding in the case now before us was "of the character involved" in *Ward* and not "of the character involved" in *Boyd.* Unlike *Boyd,* the forfeiture provision here was not a part of the statute creating the criminal offense itself. Unlike *Boyd,* forfeiture was not simply one of the sanctions automatically available for a conviction of the criminal offense. As in *Ward,* by contrast, the forfeiture provision and the criminal provision in this case are to be found in separate statutes, the direct lineal antecedents of which had been enacted sixteen years apart. The drug-related forfeiture provision of the law is now found in Art. 27, § 297. It has been through a series of statutory changes but ultimately traces back to Laws of 1951, ch. 471, § 352A. The criminal statute under which Holmes could have been charged in this case is Art. 27, § 286. It too has been through a series of statutory changes but ultimately traces back to Laws of 1935, ch. 59.

In this very significant regard, therefore, the automobile forfeiture in this case was not "of the character involved" in the *Boyd* case. The direct reliance of *One 1958 Plymouth*

*Sedan* on the "nature" of the particular forfeiture proceeding "described by" *Boyd* could not have been more clear. Justice Goldberg's opinion for the Court emphasized that reliance:

> In sum, we conclude that *the nature of a forfeiture proceeding, so well described by Mr. Justice Bradley* in *Boyd*, ... *support[s] the conclusion* that the exclusionary rule is applicable to forfeiture proceedings such as the one involved here.

380 U.S. at 702, 85 S.Ct. at 1251 (Emphasis supplied).

Whereas *Boyd* had used the term "quasi-criminal" to characterize a particular forfeiture sanction that was part of the criminal statute itself, *One 1958 Plymouth Sedan*, advertently or inadvertently, lifted the term out of its originating context and seemed to endow it with a broad talismanic capacity:

> Finally as Mr. Justice Bradley aptly pointed out in *Boyd*, a forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law.

380 U.S. at 700, 85 S.Ct. at 1250.

Even *One 1958 Plymouth Sedan*, however, did not presume to hold that the Exclusionary Rule must be applied, categorically, to all crime-related forfeitures no matter what the circumstances or characteristics of a particular forfeiture law. It went to great pains to justify its labeling of the particular automobile forfeiture before it as punitive in character. In a very fact-specific and *ad hoc* analysis, it gave significance to the fact that the maximum criminal penalty there would be a $500 fine, whereas the forfeiture was of an automobile worth $1,000. The anomaly of the forfeiture sanction's being twice as severe as the criminal sanction obviously had impact on the Court's ultimate determination:

> If convicted of any one of the possible offenses involved, however, he would be subject, if a first offender, to a minimum penalty of a $100 fine and *a maximum penalty of a $500 fine. In this forfeiture proceeding he was subject to the loss of his automobile, which* at the time involved *had an estimated value of approximately $1,000, a higher*

*amount than the maximum fine in the criminal proceeding.* It would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible. That *the forfeiture is clearly a penalty for the criminal offense and can result in even greater punishment* than the criminal prosecution has in fact been recognized by the Pennsylvania courts.

380 U.S. at 700–01, 85 S.Ct. at 1251 (Emphasis supplied).

In sharp contrast, the forfeiture in this case is not "of the character involved" in *One 1958 Plymouth Sedan,* as it was there described. In that case, a conviction for the underlying crime threatened no jail time at all. The maximum risk of a $500 fine paled beside the loss of a $1,000 automobile. In the case before us, the value of the 1995 Corvette subject to forfeiture, $35,000, was high. As a sanction, however, it could not compare with what Holmes would have faced if convicted of the underlying crime. Under Art. 27, § 286(b)(1), he could have faced imprisonment for up to twenty years and a fine of up to $25,000 or both. As one who possessed more than 448 grains of cocaine, moreover, it would have been mandatory for the Court, pursuant to § 286(f)(3), to impose a sentence of no less than five years imprisonment with the further proviso that that mandatory minimum term could not be suspended and that for that term, Holmes would have been ineligible for parole. The forfeiture provision is furthermore available for second offenders for this offense who, pursuant to § 293, would be eligible for a term of imprisonment of up to forty years or a fine of up to $50,000, or both. The anomaly between the sanctions that the Supreme Court found significant in *One 1958 Plymouth Sedan* is not remotely present in this case. This forfeiture is not "of the character involved" in that one.

What emerged from *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), was that the Supreme Court did not interpret *One 1958 Plymouth Sedan* as having

established an absolute rule applying the Exclusionary Rule to all crime-related forfeiture cases. The Supreme Court treated *One 1958 Plymouth Sedan* as having held only that the Exclusionary Rule applies to those forfeiture proceedings that may fairly be characterized as criminal rather than civil.

Following a gambling raid by local Los Angeles police, federal authorities in *Janis* seized $4,940 in cash that had been taken in the gambling raid. Although the seizure by the Internal Revenue Service was, in practical effect, a forfeiture of the cash, the cash was technically used 1) as evidence to establish a tax assessment against Janis for unpaid wagering taxes and 2) as the object of a levy in partial satisfaction of that assessment. After evidence was introduced showing that the initial police search and seizure had been in violation of the Fourth Amendment, the federal District Court ruled that the cash would be suppressed in the tax assessment proceeding. The judge ruled that all of the evidence against Janis "was obtained directly or indirectly as a result of the search pursuant to the defective search warrant" and that the subsequent assessment, therefore, "was based in substantial part, if not completely, on illegally procured evidence ... in violation of [respondent's] Fourth Amendment rights to be free from unreasonable searches and seizures." 428 U.S. at 439, 96 S.Ct. at 3025. The United States Court of Appeals for the 9th Circuit affirmed the District Court's decision to suppress any use of the $4,940 as evidence and to order its return to Janis.

In holding that the Exclusionary Rule had no applicability to such civil proceedings, the Supreme Court made the following blanket and unqualified statement:

> In the complex and turbulent history of the rule, *the Court never has applied it to exclude evidence from a civil proceeding,* federal or state.

428 U.S. at 447, 96 S.Ct. at 3029 (Footnote omitted; emphasis supplied).

In a footnote, the Supreme Court acknowledged the existence of *One 1958 Plymouth Sedan* but did not treat that case as an exception to its statement that the Rule had *never* been

applied to a civil proceeding. The Court explained away *One 1958 Plymouth Sedan* as a case dependent on the express finding that the forfeiture proceeding which it was reviewing was, in fact, criminal rather than civil:

> The Court has applied the exclusionary rule in a proceeding for forfeiture of an article used in violation of the criminal law. *Plymouth Sedan v. Pennsylvania. There it expressly relied on the fact that "forfeiture is clearly a penalty for the criminal offense"* and "[i]t would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible." See also *Boyd v. United States,* where a forfeiture proceeding was characterized as "quasi-criminal."

428 U.S. at 447 n. 17, 96 S.Ct. at 3029 n. 17 (Citations omitted; emphasis supplied).

Forfeiture proceedings come in all shapes and sizes and from different legislative bodies with different legislative purposes. *Janis*'s characterization of *One 1958 Plymouth Sedan* made it clear that that case's extension of the Exclusionary Rule could only apply to those forfeitures which can legitimately be found to be "a penalty for the criminal offense," to wit, that can be deemed "quasi-criminal." *One 1958 Plymouth Sedan,* as thus characterized by *Janis,* contemplates that the State must prove the actual commission of a criminal act. As will be more fully discussed, the Maryland forfeiture action under review does not require proof of the actual commission of a crime.

Eight years after *Janis,* the Supreme Court decided *Immigration and Naturalization Serv. v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), a case that also declined to apply the Exclusionary Rule to a civil proceeding (a deportation hearing). That case reaffirmed *Janis*'s earlier observation that the Exclusionary Rule had never been applied to any sort of a civil proceeding:

At stake in *Janis* was application of the exclusionary rule in a federal civil tax assessment proceeding following the unlawful seizure of evidence by state ... officials. The Court noted at the outset that "[i]n the complex and turbulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state." 468 U.S. at 1041–42, 104 S.Ct. at 3485.

In *Whitaker v. Prince George's County*, 307 Md. 368, 514 A.2d 4 (1986), the Court of Appeals ruled that the Exclusionary Rule did not apply to a proceeding seeking to enjoin the operation of a bawdyhouse. The operators of the bawdyhouse urged on the Court the case of *One 1958 Plymouth Sedan* as support for their argument that the Rule should apply. In rejecting the argument, the Court of Appeals pointed out that *One 1958 Plymouth Sedan* is limited to those cases where the "forfeiture is clearly a penalty for the criminal offense":

> For this proposition, appellants rely on the 1965 case of *One Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170. There, the Supreme Court applied the exclusionary rule in a proceeding for forfeiture of an automobile used in violation of the criminal law. In so doing, the Court expressly relied on the fact that "forfeiture is clearly a penalty for the criminal offense ... "

307 Md. at 380, 514 A.2d 4. *Whitaker* found *One 1958 Plymouth Sedan* to be inapposite because the County's proposed action in *Whitaker*, unlike the forfeiture in *One Plymouth Sedan*, was not "vindictive or punitive" in purpose. 307 Md. at 383, 514 A.2d 4.

In *Chase v. State*, 309 Md. 224, 247, 522 A.2d 1348 (1987), the Court of Appeals held that "[i]n our revocation of probation proceedings the revocation is 'not a penalty for the criminal offense' even though the new criminal offense may be the basis for the revocation." That internal quotation was placed there to distinguish Maryland's probation revocation proceedings from the necessary predicate on which *One Plymouth Sedan* relied in order to extend the Exclusionary Rule to the forfeiture proceeding before it. In pinpointing that interi-

or holding of *One Plymouth Sedan* as the *sine qua non* of its larger holding, the opinion of Judge Orth quoted with approval from *United States v. Janis*'s interpretation of *One 1958 Plymouth Sedan.* 309 Md. at 247–48, 522 A.2d 1348. Judge Orth concluded his analysis:

> For further support that *Plymouth Sedan v. Pennsylvania* provides no sound basis for applying the exclusionary rule to civil or administrative proceedings, *see* W. LaFave and J. Israel, *Criminal Procedure,* § 3.1(g). There it is pointed out that the courts which hold that the exclusionary rule applies in forfeiture proceedings rely on *Plymouth*'s *reasoning that the rule applies to proceedings which are "quasi-criminal" in that their object is to penalize for the commission of an offense* against the law and could result in even greater punishment than the criminal prosecution.

309 Md. at 248, 522 A.2d 1348 (Emphasis supplied).

The determination of which crime-related forfeiture proceedings are subject to the apparent rule of *One 1958 Plymouth Sedan* is of necessity an *ad hoc* determination, because it necessarily depends upon an antecedent determination of whether the purpose and the effect of a given forfeiture proceeding is, in the last analysis, criminal or civil in its basic nature. Much will inevitably depend on the expression of a particular legislative intent. A forfeiture such as that in *Boyd v. United States,* where the criminal statute itself included forfeiture in its list of automatically available sanctions, might easily be classified as criminal in nature. Other forfeitures, on the other hand, such as where the proceeds from the forfeited goods are earmarked to recompense the State for its larger investigative efforts or where the owner subject to the forfeiture need not even have been the perpetrator of the offense which triggers the forfeiture, are decidedly far more civil in their natures. When dealing with so many different forfeiture laws with so many different characteristics from so many different jurisdictions, no simple single categorization is possible. *One 1958 Plymouth Sedan* itself went out of its way, for instance, to distinguish the forfeiture before it from other situations involving the forfeiture of contraband. *One 1958*

*Plymouth Sedan* did not purport to speak in universal terms, though many have since read it that way. It is clear that some *ad hoc* determination is called for, forfeiture law by forfeiture law.

In making the determination of whether a particular proceeding is criminal or civil in its fundamental nature, our decisional criteria are now far more sophisticated than they were when *Boyd* was decided in 1886 or even when *One 1958 Plymouth Sedan* was decided in 1965. Those cases were from an era when appellate courts, including the Supreme Court, did not hesitate to shoot from the hip when projecting labels like civil, criminal, and quasi-criminal. Today the necessary analysis is far more refined and the labeling is far more tightly circumscribed.

## X.

### *The Currently Controlling Criteria For What Is "Criminal" and What Is "Civil"*

*One 1958 Plymouth Sedan* expressly enunciated as its *ratio decidendi* "the nature of a forfeiture proceeding, so well described by Mr. Justice Bradley in *Boyd,*" as "quasi-criminal in character." 380 U.S. at 700, 702, 85 S.Ct. at 1250–51. The very notion that a court will, except in extreme circumstances, override a legislative determination that a particular proceeding is civil on the basis of the court's characterization of the proceeding as "quasi-criminal," or, in part at least, penal or punitive in purpose or effect and will, therefore, treat the proceeding as criminal, with the attendant attachment of constitutional protections, has now been completely superseded. *United States v. Calandra, Stone v. Powell, United States v. Janis, United States v. Havens,* and *United States v. Ceccolini* all dealt with proceedings that were "quasi-criminal in character," but that fact did not call for the automatic application of the Exclusionary Rule. There was rather a "cost-benefit" balancing between the impairment to the truth-seeking process, on the one hand, and incremental deterrence,

on the other, a balancing process which *One 1958 Plymouth Sedan* did not apply and to which it did not even allude.

The concurring opinion of Justice Kennedy in *United States v. Ursery,* 518 U.S. 267, 293, 116 S.Ct. 2135, 2150, 135 L.Ed.2d 549, 571 (1996), stated emphatically that the statements in both *Boyd* and *One 1958 Plymouth Sedan* that forfeiture proceedings were penal or punitive in nature were no longer, if they ever were, authoritative:

> Although there is language in our cases to the contrary, *see One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965); *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886), *civil in rem forfeiture is not punishment of the wrongdoer for his criminal offense.*

(Emphasis supplied).

■ The now well settled law is that the determination of whether a particular legal proceeding shall be civil, with its attendant procedural incidents, or criminal, with its attendant procedural incidents and constitutional protections, is in the first instance a legislative determination. The most articulate statement of the principle is probably that in *United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980):

> This Court has often stated that the question *whether a particular statutorily-defined penalty is civil or criminal is a matter of statutory construction.* Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.

448 U.S. at 248, 100 S.Ct. at 2641 (Citations omitted; emphasis supplied). *See also One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 236–37, 93 S.Ct. 489, 492–93, 34 L.Ed.2d 438 (1972); *Allen v. Illinois,* 478 U.S. 364, 368, 106 S.Ct. 2988, 2991–92, 92 L.Ed.2d 296 (1986); *United States v. Ursery,* 518 U.S. 267, 278, 116 S.Ct. 2135, 2142, 135 L.Ed.2d 549 (1996);

*Hudson v. United States,* 522 U.S. ——, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).

■ In applying that first prong of the *Ward* test, strong indications of legislative intent may be found in the procedures prescribed for the litigation in question. *Helvering v. Mitchell,* 303 U.S. 391, 402–04, 58 S.Ct. 630, 634–35, 82 L.Ed. 917 (1938), observed in this regard:

Civil procedure is incompatible with the accepted rules and constitutional guaranties governing the trial of criminal prosecutions, and where civil procedure is prescribed for the enforcement of remedial sanctions, those rules and guaranties do not apply.... [I]f the prescribed proceeding is in the form of a civil suit, a verdict may be directed against the defendant; there is no burden upon the Government to prove its case beyond a reasonable doubt, and it may appeal from an adverse decision; furthermore, the defendant has no constitutional right to be confronted with the witnesses against him, or to refuse to testify.

(Footnotes omitted).

In *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 363, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361 (1984), the Supreme Court concluded that the proceeding under review was civil in nature in significant measure because the statute creating the proceeding established civil procedural mechanisms for adjudicating it:

Applying the first prong of the *Ward* test to the facts of the instant case, we conclude that Congress designed forfeiture under § 924(d) as a remedial civil sanction. *Congress' intent in this regard is most clearly demonstrated by the procedural mechanisms published for enforcing forfeitures under the statute...* In contrast to the *in personam* nature of criminal actions, actions *in rem* have traditionally been viewed as civil proceedings, with jurisdiction dependent upon seizure of a physical object.... *By creating such distinctly civil procedures for forfeitures* under § 924(d),

*Congress has "indicate[d] clearly that it intended a civil, not a criminal, sanction."*

(Emphasis supplied).

■■■■ Although the expressed intent of the legislative body on the "civil" versus "criminal" question is due significant deference, it is by no means immune from judicial review. There will be cases where, notwithstanding legislative intent, a statutory scheme may be deemed so penal in purpose or effect as to override legislative intent to the contrary and to require that protections surrounding criminal proceedings be afforded. There is, however, a heavy burden of proof on the party seeking to override the voice of the legislature. *United States v. Ward,* 448 U.S. at 248–49, 100 S.Ct. at 2641, explained the judicial "trumping" mechanism:

> Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further *whether the statutory scheme was so punitive either in purpose or effect as to negate that intention. In regard to this latter inquiry, we have noted that "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground."*

(Citation omitted; emphasis supplied').

The benchmark case for determining when ostensibly civil sanctions are so punitive in nature as to require a court to overrule a legislative intent to the contrary is *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The *Kennedy v. Mendoza–Martinez* case set out a list of factors that are pertinent when making that determination. 372 U.S. at 168–69, 83 S.Ct. at 567–68. *See also Allen v. Illinois,* 478 U.S. at 369, 106 S.Ct. at 2992; *United States v. Ursery,* 518 U.S. at 278, 116 S.Ct. at 2142; *Hudson v. United States,* 522 U.S. at ——, 118 S.Ct. at 493.

Lest anyone be skeptical as to the general applicability of the "civil" versus "criminal" test for legislative intent because most of the recent statements on that subject have been in the exclusive context of the double jeopardy clause, let it be noted that *United States v. Ward* was dealing with the implications

of the civil-criminal issue on the applicability of the Fifth Amendment privilege and that *Kennedy v. Mendoza–Martinez* was dealing with the implications of that question for a whole panoply of Sixth Amendment rights, including notice, confrontation, compulsory process for obtaining witnesses, trial by jury, and assistance of counsel. 372 U.S. at 164, 83 S.Ct. at 565. The test is generic and its application not limited to double jeopardy law.

## XI.

### *Statutory Forfeitures Generally As Civil In Rem Actions*

Statutory forfeiture laws cover a wide variety of subjects and situations and implicate various adjudicative procedures and legislative purposes. As a broad general rule, however, they possess the common denominator of being civil *in rem* actions directed at an offending object itself. They are not primarily part of the punishment of a criminal offender and, indeed, are not dependent on the fact that the owner of the goods to be forfeited committed any offense at all.

The first occasion the Supreme Court had to consider forfeiture was in the case of *The Palmyra*, 12 Wheat. 1, 25 U.S. 1, 6 L.Ed. 531 (1827). The opinion of Justice Story examined the basic nature of forfeitures, contrasting earlier common law forfeitures with later statutory forfeitures. Justice Story pointed out that at the common law, conviction itself for many felonies included as one of its automatic penalties the forfeiture of the felon's goods and chattels to the Crown. That type of forfeiture was clearly *in personam* in character and punitive in effect. Albeit in a statutory context, the automatically available forfeiture penalty as part of the criminal statute itself was the thing being dealt with by *Boyd v. United States*. The forfeiture action was inextricably intertwined with the criminal culpability of the owner or the possessor of the chattel subject to the forfeiture.

Justice Story then pointed out that, in dramatic and diametric contrast, statutory forfeiture laws are generally of a very different nature:

But this doctrine never was applied to seizures and forfeitures, created by statute, *in rem* ... The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing ... [T]he practice has been, and so this Court understand the law to be, that *the proceeding in rem stands independent of, and wholly unaffected by any criminal proceeding in personam.* This doctrine is deduced from a fair interpretation of the legislative intention apparent upon its enactments.

25 U.S. at 14–15 (Emphasis supplied).

## A. The Innocent Owner Cases

It was in the case of *United States v. Brig Malek Adhel,* 2 How. 210, 43 U.S. 210, 11 L.Ed. 239 (1844), that the Supreme Court first squarely asserted that the innocence of the owner of the chattel subject to forfeiture is no defense to the forfeiture action. The brig "Malek Adhel" was forfeited to the United States because it had been used as the instrumentality for several acts of piracy on the high seas. Although the captain of the vessel was obviously at fault, it was conceded that the owners, a shipping firm in New York, were completely free of guilt. As to them, Justice Story's opinion observed:

The owners are confessedly innocent of all intentional or meditated wrong. They are free from any imputation of guilt, and every suspicion of connivance with the master in his hostile acts and wanton misconduct.

43 U.S. at 237.

The Supreme Court went on to hold, however, that the innocence of the owner was no bar to the forfeiture of the vessel:

The next question is, whether the innocence of the owners can withdraw the ship from the penalty of confiscation ... Here, again, it may be remarked that the act makes no exception whatsoever, whether the aggression be with or without the co-operation of the owners. The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches,

without any reference whatsoever to the character or conduct of the owner.

43 U.S. at 233.

In *Dobbins' Distillery v. United States,* 96 U.S. 395, 24 L.Ed. 637 (1877), the lessee of a distillery failed to keep proper business records and made false entries in the books with the intent to defraud the United States of revenue. In an attempt to defend against the forfeiture of the distillery and the real property on which it sat, the owner averred that he had no knowledge of the fact that his lessee was making fraudulent entries on the books of his distilling business. In affirming the propriety of jury instructions to that effect, the Supreme Court held that the innocence of the owner was no defense to the forfeiture. In its discussion, the Supreme Court contrasted forfeiture proceedings that are of a criminal character with forfeiture proceedings that are of a civil nature:

> Cases arise, undoubtedly, where the judgment of forfeiture necessarily carries with it, and as part of the sentence, a conviction and judgment against the person for the crime committed; and *in that state of the pleadings it is clear that the proceeding is one of a criminal character; but where the information,* as in this case, *does not involve the personal conviction of the wrong-doer for the offence charged, the remedy of forfeiture claimed is plainly one of a civil nature; as the conviction of the wrong-doer must be obtained,* if at all, *in another and wholly independent proceeding.*

96 U.S. at 399 (Emphasis supplied).

The Court reiterated that the innocence of the owner was no bar to the forfeiture action in the civil *in rem* proceeding under review:

> Cases often arise where the property of the owner is forfeited on account of the fraud, neglect, or misconduct of those intrusted with its possession, care, and custody, even when the owner is otherwise without fault.

96 U.S. at 401.

*See also J.W. Goldsmith, Jr.-Grant Co. v. United States,* 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921) (Innocent condi-

tional vendor of a Hudson automobile suffered forfeiture of it because the purchaser taxicab operator used it to conceal 58 gallons of untaxed whiskey); *Van Oster v. Kansas,* 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354 (1926) ("It has long been settled that statutory forfeitures of property entrusted by the innocent owner or lienor to another who uses it in violation of the revenue laws ... is not a violation of the due process clause.")

The seminal case in recent decades is *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). An innocent business establishment leased a pleasure yacht to two persons who were subsequently found in possession of marijuana on board the yacht. Under a local forfeiture statute, the Commonwealth of Puerto Rico forfeited the yacht as a conveyance that had been used to facilitate the forbidden possession. A United States District Court enjoined the forfeiture and the Supreme Court reversed.[27]

Writing for the Court, Justice Brennan thoroughly reviewed all of the forfeiture cases from *The Palmyra* through *Van Oster v. Kansas* and reconfirmed that the criminal "innocence of the owner of property subject to forfeiture has almost

---

**27.** The erosive effect of *Calero–Toledo v. Pearson Yacht* on *One 1958 Plymouth Sedan* was noted in the perceptive opinion of Judge Marvin Aspen in *United States v. One 1988 Ford Mustang,* 728 F.Supp. 495, 498 (N.D.Ill.1989):

We are not sure whether *Plymouth Sedan* and *Pearson Yacht* can easily be reconciled. If the civil forfeiture in *Plymouth Sedan* was really against the *res*, as *Pearson Yacht* suggests, then it is not clear why the exclusionary rule should apply—after all, the Fourth Amendment protects only "[t]he right of the people," not the right of automobiles. Perhaps the Court believed that the forfeiture in *Plymouth Sedan* was really a criminal forfeiture, even though civil in form; indeed, later Supreme Court cases may be read to put this gloss on the *Plymouth Sedan* case. *See United States v. Janis,* 428 U.S. 433, 447 n. 17, 96 S.Ct. 3021, 3029 n. 17, 49 L.Ed.2d 1046 (1976); *One Lot Emerald Cut Stones & One Ring v. United States,* 409 U.S. 232, 236 n. 6, 93 S.Ct. 489, 492 n. 6, 34 L.Ed.2d 438 (1972). At any rate, if there is an inconsistency between *Plymouth Sedan* and *Pearson Yacht,* we must resolve it in favor of the more recent *Pearson Yacht* case.

uniformly been rejected as a defense." 416 U.S. at 683, 94 S.Ct. at 2092. The Supreme Court observed that this seemingly harsh application of the forfeiture laws against owners who have committed no crime may have the salutary effect of deterring negligent entrustment:

To the extent that such forfeiture provisions are applied to lessors, bailors, or secured creditors who are innocent of any wrongdoing, confiscation may have the desirable effect of inducing them to exercise greater care in transferring possession of their property.

416 U.S. at 687–88, 94 S.Ct. at 2094. *See also Bennis v. Michigan,* 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) ("[A] long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use.")

In these not-infrequent innocent-owner cases, the forfeiture self-evidently does not punish the owner for his crime for the owner has committed no crime. Equally self-evidently, the third party who used the chattel to perpetrate a crime is not punished by the forfeiture for the person who suffers the loss is the owner and not the perpetrator. These cases are offered to demonstrate the truism that some forfeitures under some circumstances obviously are not punitive, penal, or quasi-criminal and that any absolute pronouncement that all forfeitures are is, therefore, transparently fallacious.

Again, let it be noted that none of the above cases was considered in the context of the Double Jeopardy Clause.

## B. The Double Jeopardy Cases

Another line of cases, involving the Double Jeopardy Clause, shows the attenuated nature of the connection between a forfeiture proceeding and a criminal prosecution for a related offense and reiterates the Court's characterization of forfeiture as an action that is *not* punishment for a crime.

In *Various Items of Personal Property v. United States,* 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931), the Waterloo

Distilling Corporation had conducted its distilling business in such a way as to defraud the United States Government of tax revenues. The corporation and some of its officials were convicted of conspiracy to violate the law by fraud. As a defense against a subsequent forfeiture proceeding involving the distillery building itself, a warehouse, and a denaturing plant, the corporation interposed a plea of double jeopardy. In rejecting the plea, the Supreme Court asserted that a civil *in rem* forfeiture is not, even partially, punishment for the related criminal offense:

> It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient. In a criminal prosecution it is the wrongdoer in person who is proceeded against, convicted and punished. *The forfeiture is no part of the punishment for the criminal offense.*

282 U.S. at 581, 51 S.Ct. at 284 (Emphasis supplied).

*Helvering v. Mitchell,* 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), involved a deficiency tax assessment rather than a forfeiture. By way of considered *dicta,* however, the Court observed that the forfeiture sanction, albeit sometimes severe, is not criminal and is not subject to the rules regulating criminal prosecutions:

> Forfeiture of goods or their value and the payment of fixed or variable sums of money are other sanctions which have been recognized as enforceable by civil proceedings since the original revenue law of 1789. *In spite of their comparative severity, such sanctions have been upheld against the contention that they are essentially criminal and subject to the procedural rules governing criminal prosecutions.*

303 U.S. at 400, 58 S.Ct. at 633 (Emphasis supplied).

In *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972), a jewelry dealer had entered the United States without declaring the lot of emeralds that he was bringing into the country. He was indicted and tried but acquitted of the smuggling charges. He sought

to interpose that acquittal as a double jeopardy bar when the United States moved for the forfeiture of the emeralds.

In denying his defense, the Supreme Court reiterated that the "question of whether a given sanction is civil or criminal is one of statutory construction." 409 U.S. at 237, 93 S.Ct. at 493. In concluding that the forfeiture in that case was a civil sanction, the Court found significant the fact that the criminal provision and the forfeiture provision were found in separate provisions of the Tariff Act:

The fact that the sanctions were separate and distinct and were contained in different parts of the statutory scheme is relevant in determining the character of the forfeiture. *Congress could and did order both civil and criminal sanctions, clearly distinguishing them. There is no reason for frustrating that design.*

409 U.S. at 236–37, 93 S.Ct. at 493 (Emphasis supplied).

In *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), a gun dealer was tried and acquitted on the charge of dealing in firearms without a license. He attempted to assert that acquittal as a double jeopardy bar when the government moved to forfeit the firearms. The United States Court of Appeals for the 4th Circuit ruled in the gun dealer's favor but the Supreme Court reversed.

The Supreme Court reconfirmed that the resolution of the issue of whether a forfeiture is criminal or civil in character is essentially a matter of statutory interpretation:

Unless the forfeiture sanction was intended as punishment, so that the proceeding is essentially criminal in character, the Double Jeopardy Clause is not applicable. Resolution of this question begins as a matter of statutory interpretation.

465 U.S. at 362, 104 S.Ct. at 1105 (Citation omitted).

In applying the first prong of the statutory construction test laid out in *United States v. Ward*, the Supreme Court concluded, in significant measure because of the procedural mechanisms provided by the statute, that the Congress intended the

firearms forfeiture in that case to be civil in character. It then turned to the second prong of the test laid out in *United States v. Ward* and concluded that the claimant of the property had not carried his heavy burden of overriding the expressed intent of the Congress:

> [A]n analysis of the *Mendoza–Martinez* factors in no way undermines Congress' classification of the § 924(d) forfeiture action as a civil sanction. Mulcahey has failed to establish by the "clearest proof" that Congress has provided a sanction so punitive as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty." We accordingly conclude that the forfeiture mechanism set forth in § 924(d) is not an additional penalty for the commission of a criminal act, but rather is a separate civil sanction, remedial in nature.

465 U.S. at 366, 104 S.Ct. at 1107.

## XII.

### *The "Quasi–Criminal" or "Partly Punitive" Hybrid is Now Extinct*

Until *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549, was filed in 1996, two irreconcilable approaches were in the field simultaneously and were utilized randomly for determining whether a given statutory proceeding was civil in nature and would enjoy the benefit of civil procedures or was sufficiently criminal in nature to be constrained by the constitutional protections afforded criminal proceedings. The approach that has ultimately prevailed was that hammered out in such cases as *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) and *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). This is the test by which the judicial branch largely defers to legislative intent on the issue. It is a broad-based test that, albeit including forfeitures, is not confined to forfeiture proceedings alone and, albeit applicable to double jeopardy cases, does not concern the Double Jeopardy Clause alone.

The alternative approach was more result-oriented and was one wherein the judicial branch did not hesitate, *sua sponte,* to declare a particular proceeding "punitive" or "penal" or "quasi-criminal" in order to impose a constitutional protection without any deference to or consideration of legislative intent. That approach traced back to *Boyd v. United States,* and its dispositive characterization of the forfeiture proceeding before it as "quasi-criminal." 116 U.S. at 634, 6 S.Ct. at 534.

The "authoritative statement" quoted from *Boyd* and found "to be dispositive" by *One 1958 Plymouth Sedan,* 380 U.S. at 698, 85 S.Ct. at 1249, included the following:

> "We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, *though they may be civil in form, are in their nature criminal."*

*Boyd,* 116 U.S. at 633–34, 6 S.Ct. at 534, quoted by *One 1958 Plymouth Sedan,* 380 U.S. at 697, 85 S.Ct. at 1249 (Emphasis supplied). In holding that the forfeiture before it was "clearly a penalty for the criminal offense," 380 U.S. at 701, 85 S.Ct. at 1251, *One 1958 Plymouth Sedan* again relied expressly on *Boyd:*

> Finally as Mr. Justice Bradley aptly pointed out in *Boyd, a forfeiture proceeding is quasi-criminal in character. Its object,* like a criminal proceeding, *is to penalize for the commission of an offense against the law.*

380 U.S. at 700, 85 S.Ct. at 1250 (Emphasis supplied).

The holding in *One 1958 Plymouth Sedan* was absolutely dependent on that characterization of the forfeiture proceeding before it as quasi-criminal and punitive in nature. The case did not even consider, let alone hold, that the Exclusionary Rule was applicable to forfeiture proceedings generally, notwithstanding their civil nature. It, rather, considered the forfeiture before it to be punitive in effect and, therefore, criminal and thereby subject to the sanction of the Exclusionary Rule on the ostensible authority of *Boyd.*

Even as it referred to the decision in *One 1958 Plymouth Sedan, United States v. Janis* expressly stated that "the Court

*never* has applied [the Exclusionary Rule] to exclude evidence from a civil proceeding." 428 U.S. at 447, 96 S.Ct. at 3029 (Emphasis supplied). *Janis* then characterized *One 1958 Plymouth Sedan* as a case that had "expressly relied on the fact that 'forfeiture is clearly a penalty for the criminal offense.'" 428 U.S. at 447 n. 17, 96 S.Ct. at 3029 n. 17. The forfeiture law in *One 1958 Plymouth Sedan* was not treated as having been civil.

The high water mark, or the "last hurrah," for this *Boyd–One 1958 Plymouth Sedan* approach of using the punitive effect of a sanction to determine whether a criminal-law-based constitutional protection should attach came with *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). In reaching for a result in a double jeopardy case involving the imposition of civil monetary penalties, the Court eschewed reliance on statutory interpretation:

> [W]hile recourse to statutory language, structure, and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general matter, the approach is not well suited to the context of the "humane interests" safeguarded by the Double Jeopardy Clause's proscription of multiple punishments.

490 U.S. at 447, 109 S.Ct. at 1901. It was clear that the Court predicated its finding on the fact that the sanction served, at least in part, a punitive function and that it treated that fact as sufficient to "trump" any distinction between criminal law and civil law:

> *[T]he labels "criminal" and "civil" are not of paramount importance.* It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. *The notion of punishment,* as we commonly understand it, *cuts cross the division between the civil and the criminal law.*

490 U.S. at 447–48, 109 S.Ct. at 1901 (Emphasis supplied).

The test articulated by *Halper* looked only to the tell-tale presence of punishment and further suggested that the goals

of retribution and deterrence were sure-fire indicia of punishment. A civil sanction that did not *solely* serve a purpose other than retribution or deterrence would, therefore, *ipso facto* implicate the constitutional protection:

> We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence. Furthermore, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." From these premises, it follows that *a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment,* as we have come to understand the term.

490 U.S. at 448, 109 S.Ct. at 1902 (Citations omitted; emphasis supplied). That *Halper* approach, of course, is precisely the approach relied on by both *Boyd* and *One 1958 Plymouth Sedan.* "Even though called civil, if it is punitive, it is at least quasi-criminal; if quasi-criminal, it will be treated as criminal."

The handwriting on the wall for the repudiation of that approach was placed there by Justice Scalia in his dissent in *Montana Dept. of Revenue v. Kurth Ranch,* 511 U.S. 767, 803–04, 114 S.Ct. 1937, 1958–59, 128 L.Ed.2d 767 (1994), where he observed that "the erroneous holding [of *Halper*] produces results too strange for judges to endure" and that "[i]t is time to put the *Halper* genie back in the bottle."

*Ursery* began the process of putting the *Halper* genie back in the bottle. In the two cases that were consolidated for consideration by the Court, the United States Courts of Appeal for the 6th Circuit and the 9th Circuit had held that ostensibly civil forfeiture proceedings nonetheless constituted punishment and, therefore, implicated the Double Jeopardy Clause. Both of the lower federal courts had relied on the trilogy of cases of *Halper, Kurth Ranch,* and *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In reversing, the Supreme Court distinguished between a civil forfeiture, which is an *in rem* proceeding directed at an

inorganic thing itself, and a civil penalty, which is an *in personam* action aimed at a guilty individual:

> *Halper* involved not a civil forfeiture, but a civil penalty. That its rule was limited to the latter context is clear from the decision itself, from the historical distinction that we have drawn between civil forfeiture and civil penalties. . . .
>
> Since at least *Various Items,* we have distinguished civil penalties such as fines from civil forfeiture proceedings that are *in rem.* While a "civil action to recover ... penalties, is punitive in character," and much like a criminal prosecution in that "it is the wrongdoer in person who is proceeded against ... and punished," in an *in rem* forfeiture proceeding, "it is the property which is proceeded against, and by resort to a legal fiction, held guilty and condemned."

518 U.S. at 283–84, 116 S.Ct. at 2144–45.

*Ursery* held that the basic *Halper* approach, relying on a judicial characterization of a sanction as punishment for its doctrinal toehold, had no applicability to civil *in rem* forfeiture proceedings. What is before us, of course, is a civil *in rem* forfeiture proceeding.

After rejecting the *Halper* approach, the Supreme Court reaffirmed deference to legislative intent and reliance on the two-part test set out in *United States v. Ward.* One of the two forfeiture laws being reviewed by the Supreme Court in *Ursery,* 21 U.S.C. § 881, is the federal counterpart of Article 27, § 297, which is before us in the present case. Applying the first part of the two-part test, the Supreme Court had no difficulty in concluding that that particular drug-related forfeiture statute, along with another forfeiture statute involving money laundering, was intended by Congress to be treated in all respects as civil in nature:

> There is little doubt that Congress intended these forfeitures to be civil proceedings.... "Congress' intent in this regard is most clearly demonstrated by the procedural mechanisms it established for enforcing forfeitures under the statute[s]." Both 21 U.S.C. § 881 and 18 U.S.C. § 981,

which is entitled "Civil forfeiture," provide that the laws "relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws ... shall apply to seizures and forfeitures incurred" under § 881 and § 981. Because forfeiture proceedings under the customs laws are *in rem*, it is clear that Congress intended that a forfeiture under § 881 or § 981 ... would be a proceeding *in rem*. Congress specifically structured these forfeitures to be impersonal by targeting the property itself. "In contrast to the *in personam* nature of criminal actions, actions *in rem* have traditionally been viewed as civil proceedings, with jurisdiction dependent upon seizure of a physical object."

518 U.S. at 288–89, 116 S.Ct. at 2147.

Among the factors which *Ursery* found to be significant were the procedural incidents of the forfeiture law, procedural incidents which are also to be found in its Maryland counterpart:

Other procedural mechanisms governing forfeitures under § 981 and § 881 also indicate that Congress intended such proceedings to be civil. . . . [A]ctual notice of the impending forfeiture is unnecessary when the Government cannot identify any party with an interest in the seized article ... [S]eized property is subject to forfeiture through a summary administrative procedure if no party files a claim to the property ... [T]he burden of proof in forfeiture proceedings under § 881 and § 981, provides that once the Government has shown probable cause that the property is subject to forfeiture, then "the burden of proof shall lie upon [the] claimant," ... *"[B]y creating such distinctly civil procedures for forfeitures* under [§ 881 and § 981], *Congress has 'indicate[d] clearly that it intended a civil, not a criminal sanction.'* "

518 U.S. at 289–90, 116 S.Ct. at 2147–48 (Emphasis supplied).

Having found a legislative intent that the forfeiture proceeding be civil, the *Ursery* Court turned to the second stage of

analysis and found that there was not the "clearest proof" that the statute was so punitive in effect as to override the legislative intent:

> Moving to the second stage of our analysis, we "find that there is little evidence, much less the 'clearest proof' " that we require ... suggesting that forfeiture proceedings under 21 U.S.C. § 881(a)(6) and (a)(7), and 18 U.S.C. § 981(a)(1)(A), *are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary.* The statutes involved in this case are, in most significant respects, indistinguishable from those reviewed, and held not to be punitive, in *Various Items, Emerald Cut Stones,* and *89 Firearms.*

518 U.S. at 290, 116 S.Ct. at 2148 (Citations omitted; emphasis supplied).

Whereas *Halper* had held that a hybrid sanction containing both punitive and non-punitive aspects would be treated as punitive in nature, *Ursery* pointed out that legislative intent would not be overridden if, notwithstanding certain punitive aspects, non-punitive goals were also served:

> Most significant is that § 881(a)(6) and (a)(7), *while perhaps having certain punitive aspects, serve important non-punitive goals.* ... Requiring the forfeiture of property used to commit federal narcotics violations encourages property owners to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes. *See Bennis v. Michigan,* 516 U.S. 442, 450–52, 116 S.Ct. 994, 1000, 134 L.Ed.2d 68 (1996) ... In many circumstances, the forfeiture may abate a nuisance. *See, e.g., United States v. 141 st Street Corp.,* 911 F.2d 870 (C.A.2 1990) (forfeiting apartment building used to sell crack cocaine); *see also Bennis* (affirming application of Michigan statute abating car as a nuisance; forfeiture "prevent[s] further illicit use of" property).

518 U.S. at 290, 116 S.Ct. at 2148 (Citations omitted; emphasis supplied).

Turning its attention to the list of guidelines set out in *Kennedy v. Mendoza–Martinez* for deciding when a court might overrule legislative intent to the contrary, the *Ursery* Court found that factor after factor supported its conclusion that civil *in rem* forfeiture was not to be treated as predominantly punitive in character:

> [I]t is absolutely clear that *in rem civil forfeiture has not historically been regarded as punishment* .... Second, there is no requirement in the statutes that we currently review that the Government demonstrate scienter in order to establish that the property is subject to forfeiture; indeed, the *property may be subject to forfeiture even if no party files a claim to it and the Government never shows any connection between the property and a particular person.* Though both § 881(a) and § 981(a) contain an "innocent owner" exception, we do not think that such a provision, without more indication of an intent to punish, is relevant to the question whether a statute is punitive ... Third, though both statutes may fairly be said to serve *the purpose of deterrence,* we long have held that this purpose *may serve civil as well as criminal goals.* ... Finally, though both statutes are tied to criminal activity ... this fact is insufficient to render the statutes punitive. It is well settled that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission."

518 U.S. at 291–92, 116 S.Ct. at 2149 (Citations omitted; emphasis supplied).

If *Ursery* put the *Halper* genie back in the bottle, it was *Hudson v. United States,* 522 U.S.——, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), that inserted the cork in the bottle. In holding that neither a monetary penalty nor occupational debarment engaged the gears of the Double Jeopardy Clause, the *Hudson* Court "in large part disavow[ed] the method of analysis used in *United States v. Halper* and reaffirm[ed] the previously established rule exemplified in *United States v. Ward.*" —— U.S. at ——, 118 S.Ct. at 491. The Court, indeed, acknowledged that it had "granted *certiorari* because of concern about the wide variety of novel double jeopardy claims

spawned in the wake of *Halper*." —— U.S. at ——, 118 S.Ct. at 493.

The Supreme Court disavowed *Halper*'s *ad hoc* focus on whether a forfeiture sanction could be deemed to be, even in part, punitive. The Court reaffirmed that the question of "[w]hether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction" and that the two-part test of *United States v. Ward* should be employed in making that determination. The Court concluded that *Halper* had deviated from that traditional approach in two key regards. Initially, it failed to assess properly and to defer to legislative intent:

> First, the *Halper* Court bypassed the threshold question: whether the successive punishment at issue is a "criminal" punishment. Instead, it focused on whether the sanction, regardless of whether it was civil or criminal, was so grossly disproportionate to the harm caused as to constitute "punishment." In so doing, the Court elevated a single *Kennedy* factor—whether the sanction appeared excessive in relation to its nonpunitive purposes—to dispositive status. But as we emphasized in *Kennedy* itself, no one factor should be considered controlling as they "may often point in differing directions."

—— U.S. at ——, 118 S.Ct. at 494.

After determining that the legislative purpose had clearly been to create a civil sanction, the Court turned to the second part of the *Ward* test and held that there was no clear and decisive proof that the sanctions were so punitive as to render them criminal despite the legislative intent to the contrary:

> Turning to the second stage of the *Ward* test, we find that there is little evidence, much less the clearest proof that we require, suggesting that either OCC money penalties or debarment sanctions are "so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." First, neither money penalties nor debarment have historically been viewed as punishment. . . .

Second, the sanctions imposed do not involve an "affirmative disability or restraint," as that term is normally understood.... Third, neither sanction comes into play "only" on a finding of scienter.

—— U.S. at ——–——, 118 S.Ct. at 495–96 (Citations omitted).

Although the *Hudson* Court's consideration of the "civil" versus "criminal" question was, to be sure, in the context of the Double Jeopardy Clause, the implications were broader as the Court criticized *Halper*'s dispositive focus on the punitive character of a forfeiture sanction. This was obviously so because of the Court's reliance on *United States v. Ward* and *Kennedy v. MendozaMartinez,* which were not double jeopardy cases. The *Hudson* Court concluded "that *Halper*'s deviation from longstanding ... principles was ill considered." It observed, "As subsequent cases have demonstrated, *Halper*'s test for determining whether a particular sanction is 'punitive' ... has proved unworkable." —— U.S. at ——, 118 S.Ct. at 494. *Hudson* concluded by referring to "the confusion created by [*Halper*'s] attempting to distinguish between 'punitive' and 'nonpunitive' penalties." —— U.S. at ——, 118 S.Ct. at 495.

To the extent that the "method of analysis" employed by *Halper* has now been "disavowed" and recognized as invalid by *Hudson,* so too is the indistinguishable "method of analysis" employed by *Boyd,* and uncritically followed by *One 1958 Plymouth Sedan,* similarly invalid. Like *Halper,* the *Boyd–Plymouth Sedan* analysis did not defer to legislative intent, did not employ the two-part test of *Ward,* and erroneously focused on a single characteristic as being dispositive.

## XIII.

### Forfeiture Law in Maryland

Forfeiture law, even within a single state, is not a monolith. Forfeiture laws come in all shapes and sizes, serve different purposes, and involve various procedural incidents. Some may be so clearly and exclusively punitive in effect as to be *in personam* and criminal and properly circumscribed, therefore,

by the full panoply of constitutional protections. Others, by contrast, are so clearly remedial and *in rem* and civil as to be free of the limitations classically associated with the criminal law. It follows, ineluctably, that under *Ward's* two-part test some forfeiture laws are uncompromisedly civil in every respect whereas others, particularly under the second part of the test, might be deemed in the last analysis to be predominately punitive or quasi-criminal despite their "civil" label. A breezy generality about forfeiture will not suffice.

Our concern in this case is exclusively with the essential character, civil or criminal, of Article 27, § 297, as it provides for the forfeiture of different categories of objects related to violations of the anti-drug laws.

## A. Other Maryland Forfeiture Proceedings

Caution is necessary when dealing with the case law. A number of Maryland appellate opinions discussing forfeiture, including perhaps the leading examination of forfeiture laws generally (*Director of Finance v. Cole*), do not concern the drug-related forfeiture law now under review. They deal, rather, with cash seized in gambling raids pursuant to Art. 27, § 264. *Gatewood v. State*, 264 Md. 301, 285 A.2d 623 (1972); *United States Coin & Currency v. Director of Finance*, 279 Md. 185, 367 A.2d 1243 (1977); *Director of Finance, Prince George's County v. Cole*, 296 Md. 607, 465 A.2d 450 (1983) (the leading discussion of forfeiture referred to above); *State v. 158 Gaming Devices*, 59 Md.App. 44, 63–64, 474 A.2d 545 (1984).

That gambling-related forfeiture law went on the Maryland statute books in 1951 by virtue of Chapter 299 of the Acts of 1951. Although all of the cases refer to a § 264 proceeding as a civil *in rem* action, the disposition seems to be more closely tied to a verdict on the related criminal charge than is the case with § 297. Section 264(d)(2) provides:

[A]n acquittal, a dismissal, or a nolle prosequi with respect to the gambling charges or indictments involved in the seizure of the money, cash, or currency is prima facie evidence that it is not contraband. A conviction, plea of

guilty or of nolo contendere, and probation under the provisions of § 641 is prima facie evidence that it is contraband. No presumption in the proceeding shall attach to an entry of stet.

In parrying a defendant's effort to conflate § 297 forfeiture provisions with § 264 forfeiture provisions, *Bozman v. Office of Finance, Baltimore County,* 52 Md.App. 1, 9, 445 A.2d 1073 (1982), stressed the distinctiveness of the two laws:

We think that the Legislature meant to draw, and did draw a sharp distinction between forfeitures in gambling cases and forfeitures in controlled dangerous substances matters. The requirement of a "conviction" in a gambling case is a recognization by the General Assembly that, while gambling is unlawful, it is not such a heinous offense as to dictate forfeiture absent conviction. Violations of the controlled dangerous substances act are treated much more severely.

What the case law says, therefore, about a § 264 forfeiture may be, but is not necessarily, true about a § 297 forfeiture—and vice versa.

Completely unrelated to either of the above forfeiture laws is § 36C, governing the forfeiture of certain illegally worn or transported handguns plus all ammunition found in the immediate vicinity of such handguns. That forfeiture law was placed on the books by the Acts of 1972, Chapter 13, § 3. Interpreting that forfeiture law is the case of *State v. Crist,* 34 Md.App. 300, 367 A.2d 61 (1976).

Other statutory forfeiture provisions are to be found in Article 27, albeit without benefit of interpretive case law. As early as Chapter 550, § 350–I of the Acts of 1933 (now codified as § 380), provision was made for the automatic forfeiture, without a finding of criminality and without a hearing, of any machine gun. Chapter 456 of the Act of 1994 (now § 36H–4) provided that any unlawfully transported assault pistol is, *ipso facto,* contraband. Chapter 561, § 2 of the Acts of 1996 (now codified as § 445B) deals with the forfeiture of regulated firearms but makes the forfeiture contingent on a conviction under the Regulated Firearms Act. Chapter 394,

§ 1 of the Acts of 1967 (codified as § 425) provides for the forfeiture, as contraband, of obscene matter but only after a conviction had become final.

In addition to various statutory forfeiture laws, the case of *State v. 158 Gaming Devices,* 59 Md.App. 44, 53, 474 A.2d 545 (1984), relying on *Wagner v. Upshur,* 95 Md. 519, 52 A. 509 (1902), strongly suggests that even in the absence of a forfeiture statute, there is a common law right to forfeit even derivative, as opposed to direct, contraband. This last proposition is of highly questionable validity, but the cases, as well as the statutes, are here offered simply to illustrate the wide variety of forfeiture laws. What is true of one is by no means true of all.

## B. Earlier Versus Later Forfeiture Laws

Just as careful distinctions must be made among various contemporary forfeiture laws, a critical comparison must also be made between an existing forfeiture law and its predecessor, but superseded, provision. What is now § 297 became law on July 1, 1970 as a result of Chapter 403 of the Acts of 1970. In terms of forfeiture procedures, it bears little, if any, resemblance to the forfeiture provision it displaced.

*Commercial Credit Corp. v. State,* 258 Md. 192, 265 A.2d 748 (1970) had analyzed the predecessor provision, then codified as § 301. That earlier provision had been enacted by Chapter 471 of the Acts of 1951. In terms of legislative intent, that earlier law did not even purport to give rise to a civil proceeding. No procedural mechanics were provided. In terms of its clearly criminal purpose, *Commercial Credit* aptly pointed out, "It seems fair to say that § 301 is aimed not at the innocent but at the guilty." 258 Md. at 197, 265 A.2d 748. There was no suggestion that the proceeding was *in rem* or was aimed at the offending vehicle itself as an instrumentality.

The clear implication was that the forfeiture of the "vehicle, vessel or aircraft used or employed in the concealment, conveying or transporting of any narcotic drugs" would be part of the sentencing following a criminal conviction. The forfeiture

was expressly contingent "upon the conviction." It was not enough that the vehicle was used or employed in the narcotic traffic; it had to be used or employed "by [the] person convicted of the violation." Its purpose, moreover, was unabashedly punitive. Sect. 301 began, *"In addition to any other fines or penalties provided* for a violation of the provision of this subtitle ..." (Emphasis supplied).

Had the *Ward* two-part test been available at the time, there would have been no conceivable indication, under the first part of the test, that the Legislature in 1951 even remotely intended the forfeiture provision to be civil in nature. Under the second part of the test, moreover, had that second stage ever been reached, there *would have been* the "clearest proof" that the sanction was "so punitive" that it could have "transformed what was clearly intended as a civil remedy into a criminal penalty." What *One 1958 Plymouth Sedan* had to say about the forfeiture before it in 1965 would indisputably have applied to the drug-related forfeiture law on the Maryland statute books through June 30, 1970. The express holding of *One 1958 Plymouth Sedan* had been that

> the exclusionary rule is applicable to forfeiture proceedings **SUCH AS THE ONE INVOLVED HERE.**

380 U.S. at 702, 85 S.Ct. at 1251 (Emphasis supplied). There can be little doubt but that the Maryland law in effect through June 30, 1970 was a "forfeiture proceeding such as the one involved [t]here" and that the Exclusionary Rule might properly, therefore, have been applied to it. We can say this notwithstanding the fact that the forfeiture proceeding reviewed by *One 1958 Plymouth Sedan* was not a drug-related forfeiture law at all, let alone a post–1970 sophisticated drug-related forfeiture law, but a part of the Pennsylvania Liquor Code. *Purdon's Pennsylvania Statutes Annotated,* Title 47, § 6–601.

The final footnote to *Commercial Credit Corp. v. State,* however, was prophetic. Two days before the opinion was to be filed, the Legislature had passed Chapter 403 of the Acts of 1970, enacting what is now § 297. The footnote concluded, "It

will be observed that Chap. 403 makes what seems to be a significant change in the provisions relating to forfeiture." 258 Md. at 204, 265 A.2d 748, Note. *See Prince George's County v. One 1969 Opel,* 267 Md. 491, 495, 298 A.2d 168 (1973). The shift was seismic. What would have been a fair characterization, with attendant consequences, of Maryland's 1951 drug-related forfeiture law would have been totally inapposite to its 1970 replacement.

## C. Section 297 and Its Federal Counterpart

A sea change occurred in 1970. By Ch. 403 of the Acts of 1970, Maryland enacted the elaborately sophisticated scheme for drug-related forfeitures which is now codified as Art. 27, § 297. With only minor variations, it was patterned on the new federal drug-related forfeiture statute enacted that same year as part of the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970 and now codified as 21 U.S.C. § 881.

Self-evidently, *One 1958 Plymouth Sedan* never addressed the current Maryland forfeiture law or its federal counterpart for that case had been decided five years before the current Maryland and federal forfeiture provisions were even enacted. THE PERTINENT QUESTION IS WHETHER MARYLAND § 297 AND FEDERAL § 881 ARE "FORFEITURE PROCEEDINGS SUCH AS THE ONE INVOLVED" IN *ONE 1958 PLYMOUTH SEDAN* OR ARE FORFEITURE PROCEEDINGS OF AN ENTIRELY DIFFERENT TYPE AND CHARACTER.

In *State v. One 1983 Chevrolet Van,* 309 Md. 327, 329–30, 524 A.2d 51 (1987), Judge Orth described the dynamic legislative activity, state and federal, of 1970:

With the enactment of the "Comprehensive Drug Abuse Prevention and Control Act of 1970" by the Congress of the United States it became necessary that the states update and revise their criminal drug laws so that uniformity would be achieved between the laws of the several states and those of the federal government. Virtually all of the states,

including Maryland, did so. *See* 9 Uniform Laws Annotated 187–194 (Master Ed.) and 1986 Supplementary Pamphlet thereto 123–124. By Acts 1970, ch. 403, Maryland repealed its Uniform Narcotic Drug Act and enacted in lieu thereof the Maryland Controlled Dangerous Substances Act, Md. Code (1957, 1982 Repl.Vol.) Art. 27, §§ 276–302 (the Act). The Act contained provisions for seizures and forfeitures. Section 297.

In *State v. One 1984 Toyota Truck,* 311 Md. 171, 177, 533 A.2d 659 (1987), Judge Adkins gave his version of the legislature ferment of 1970:

> Section 297 was enacted by Ch. 403, Acts of 1970, as part of the Uniform Controlled Dangerous Substances Act (the Maryland Act). The Maryland Act was modeled on the Uniform Controlled Substances Act (the Uniform Act) promulgated by the Commissioners on Uniform State Laws in 1970. 9 U.L.A. 187 (1970). The Uniform Act was designed to achieve uniformity among state laws on the subject and between them and federal law, particularly the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970 (the Federal Act), Pub.L. No. 91–513, 84 Stat. 1236 (codified as amended at 21 U.S.C. §§ 801–966 (1982)).
>
> Section 505 of the Uniform Act deals with forfeiture, as does § 297 of the Maryland Act.

(Footnote omitted). See also Judge Wilner's summary of that beehive of state and federal legislative activity in *Douglass v. State,* 78 Md.App. 328, 340, 552 A.2d 1371 (1989).

Section 297 of the Maryland law and § 881 of the federal law are so essentially parallel that the construction of the federal forfeiture law, by cases such as *United States v. Ursery,* has been deemed a helpful guide to construing § 297 in Maryland. In *Allen v. State,* 91 Md.App. 775, 783–84, 605 A.2d 994 (1992), Judge Cathell pointed out the close relationship between the Maryland and federal provisions:

> Section 297, enacted by Chapter 403, Acts of 1970 and the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970 were modeled on the Uniform Controlled

Substances Act. The two statutes are similar and *the construction of the federal statute has been beneficial in construing the meaning of the Maryland statute.* The forfeiture provision of the federal act has been held to be civil in nature. Section 297's forfeiture provision also has been construed as civil in nature.

(Footnote and citations omitted) (Emphasis supplied). *Allen v. State* was briefly cast under a cloud by *Stratemeyer v. State,* 107 Md.App. 420, 668 A.2d 948 (1995), but soon restored to its place in the sun by *United States v. Ursery* and *One 1984 Ford Truck v. Baltimore County,* 111 Md.App. 194, 681 A.2d 527 (1996).

It was *One 1984 Ford Truck v. Baltimore County* that overruled *Stratemeyer v. State* and resuscitated *Allen v. State. See also Jones v. State,* 111 Md.App. 456, 471–84, 681 A.2d 1190 (1996). In *One 1984 Ford Truck,* Chief Judge Wilner noted the indistinguishable natures of the Maryland and the federal forfeiture statutes and relied on *Ursery*'s analysis of § 881 in concluding that § 297 was of a similar character:

> We ... find the decision and analysis in *Ursery* to be instructive. The Maryland forfeiture statute— § 297—mirrors the federal forfeiture statute— § 881—and was adopted largely from it. *Because we find no real difference in function or purpose between the State and Federal statutes, we shall use the Supreme Court's analysis as guidance in determining this case.*

111 Md.App. at 205, 681 A.2d 527 (Emphasis supplied). Judge Davis similarly observed in *Jones v. State,* 111 Md.App. at 485, 681 A.2d 1190:

> *Ursery*'s conclusion that Congress intended the federal forfeiture proceedings to be civil is highly persuasive support for our belief that the Maryland Legislature intended forfeiture proceedings under § 297 to be civil. After all, our State forfeiture provisions "mirror, and were largely adopted from, a comparable Federal forfeiture law, 21 U.S.C. § 881(a)(4) and (a)(6)."

In *Aravanis v. Somerset County*, 339 Md. 644, 655, 664 A.2d 888 (1995), Judge Bell (now Chief Judge Bell) observed: [T]he construction of the federal statute is persuasive as to the meaning of the Maryland statute.

### D. The Legislative Scheme of § 297

■ Section 297 is a comprehensive drug-related forfeiture scheme. After subsection (a) provides an extensive list of definitions, subsection (b) catalogues the "property subject to forfeiture" and lists ten separate categories. Subsections (b)(1), (2), and (3), covering controlled dangerous substances themselves, the raw materials going into their manufacture, and property used as containers for the controlled dangerous substances, essentially deal with the forfeiture of contraband *per se*, a type of forfeiture that *One 1958 Plymouth Sedan* did not presume to cover in its analysis. As a universally recognized principle it has never been deemed punitive to confiscate (and to destroy) items in which an individual is forbidden by law to have any property interest. There is no Maryland case law dealing with forfeiture under these three subsections.

It is subsection (b)(4) that concerns us in this case. It provides for the forfeiture of all "conveyances including aircraft, vehicles or vessels, which are used, or intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of" controlled dangerous substances. As a category, this grouping basically deals with instrumentalities of crime.

The case law interpreting this subsection is legion. *Prince George's County v. Blue Bird Cab*, 263 Md. 655, 284 A.2d 203 (1971); *State v. Greer*, 263 Md. 692, 284 A.2d 233 (1971); *State v. One 1967 Ford Mustang*, 266 Md. 275, 292 A.2d 64 (1972); *Prince George's County v. One 1969 Opel*, 267 Md. 491, 298 A.2d 168 (1973); *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987); *State v. One 1984 Toyota Truck*, 311 Md. 171, 533 A.2d 659 (1987); *1986 Mercedes Benz v. State*, 334 Md. 264, 638 A.2d 1164 (1994); *State v. One 1988 Toyota Pick-up Truck*, 334 Md. 359, 639 A.2d 641 (1994); *State v.*

*1976 Dodge,* 65 Md.App. 482, 501 A.2d 103 (1985); *State v. One 1982 Plymouth,* 67 Md.App. 310, 507 A.2d 633 (1986); *State v. One 1985 Ford,* 72 Md.App. 144, 527 A.2d 1311 (1987); *State v. One 1989 Harley–Davidson Motorcycle,* 90 Md.App. 445, 601 A.2d 1119 (1992); *Allen v. State,* 91 Md.App. 775, 605 A.2d 994 (1992); *One 1988 Jeep Cherokee v. Salisbury,* 98 Md.App. 676, 635 A.2d 21 (1994); *One 1984 Ford Truck v. Baltimore County,* 111 Md.App. 194, 681 A.2d 527 (1996); *Jones v. State,* 111 Md.App. 456, 681 A.2d 1190 (1996); *Thompson v. Grindle,* 113 Md.App. 477, 688 A.2d 466 (1997); *Boyd v. Hickman,* 114 Md.App. 108, 689 A.2d 106 (1997); *Howard County v. One 1994 Chevrolet Corvette,* 119 Md.App. 93, 704 A.2d 455 (1998).

Subsection (b)(5) concerns "books, records, and research" used or intended for use in violating the anti-drug laws. The utility of such items is initially evidentiary, although they might possibly be characterized as instrumentalities of the crime. There simply seems to have been a statutory determination that such items will not be returned to a defendant or anyone else following a conviction or an acquittal. There is no Maryland case interpreting this subsection.

It is subsection (b)(6), dealing basically with the forfeiture of money (but including weapons), that has been second only to subsection (b)(4) in generating litigation. Procedurally, all such items "found in close proximity to contraband controlled dangerous substances, etc.," are presumed forfeitable and the "burden of proof is upon the claimant of the property to rebut this presumption." With respect to the cash at least, the category implicates the notion of the proceeds of the drug-related crime. *Gatewood v. State,* 268 Md. 349, 301 A.2d 498 (1973); *Prince George's County v. Vieira,* 340 Md. 651, 667 A.2d 898 (1995); *Ewachiw v. Dir. of Finance,* 70 Md.App. 58, 519 A.2d 1327 (1987); *State v. Walls,* 90 Md.App. 300, 600 A.2d 1165 (1992); *Jones v. State,* 111 Md.App. 456, 681 A.2d 1190 (1996).

Subsection (b)(7) deals with drug paraphernalia, almost certainly another instance of contraband *per se.* Subsection (b)(8) deals with some esoteric commercial subtlety, and sub-

section (b)(10) deals with anything of value that was either part of a narcotics exchange or "proceeds traceable to such an exchange." None of these three subsections has generated any case law.

Subsection (b)(9) deals with real property used in connection with the narcotics traffic or deemed to be the proceeds of narcotics trafficking. The single case interpreting that subsection has been *Aravanis v. Somerset County,* 339 Md. 644, 664 A.2d 888 (1995).

Seventeen additional subsections, covering nine tightly packed pages of the Maryland Code, follow and spell out elaborate procedures governing the various kinds of forfeitures covered by § 297.

### E. The Civil *In Rem* Character of § 297

From the time of the first enactment of § 297, the Court of Appeals and this Court have consistently held that a forfeiture proceeding under § 297 is a civil *in rem* action. The first occasion the Court of Appeals had to interpret the new forfeiture law was in *Prince George's County v. Blue Bird Cab,* 263 Md. 655, 284 A.2d 203 (1971). In that opinion, Judge Digges stated emphatically:

> *Forfeiture today,* unless otherwise specifically provided by statute, *is a civil in rem action.*

263 Md. at 659, 284 A.2d 203(Emphasis supplied). Three days later, the Court of Appeals handed down another decision interpreting § 297 in the case of *State v. Greer,* 263 Md. 692, 284 A.2d 233 (1971). Again, it was Judge Digges who spoke for the Court:

> [T]he petition here cannot be filed and granted as an adjunct to a criminal case. *Forfeiture,* unless specifically provided otherwise by statute, *is a civil in rem proceeding, separate from any criminal action* and it is of little significance whether there is a criminal conviction.

263 Md. at 694, 284 A.2d 233 (Emphasis supplied). Those apparently absolute statements made in the *Blue Bird Cab* and *Greer* cases must, of course, be constitutionally qualified

by the Supreme Court's decision in *United States v. Ward* that occasionally a "statutory scheme [may be] so punitive either in purpose or effect as to negate that [legislative] intention."

In *Allen v. State, supra,* Judge Cathell clearly stated:

The statutory scheme also indicates that section 297 is civil.

91 Md.App. at 786, 605 A.2d 994. Chief Judge Wilner made the same point in *1984 Ford Truck v. Baltimore, supra:*

Under the two-part test set forth in *89 Firearms* and applied in *Ursery,* we find that forfeiture proceedings under § 297 were intended by the Maryland Legislature to be civil rather than criminal.

111 Md.App. at 205, 681 A.2d 527. That conclusion was based in part on *Ursery*'s determination with respect to the analogous provisions of 21 U.S.C. § 881:

[S]ection 297 was adopted largely from the federal forfeiture law, 21 U.S.C. § 881, and the Supreme Court has found in analyzing § 881 that "[t]here is little doubt that Congress intended these forfeitures to be civil proceedings." *Ursery,* 518 U.S. at 288, 116 S.Ct. at 2147.

111 Md.App. at 206, 681 A.2d 527.

In *Jones v. State,* 111 Md.App. 456, 485, 681 A.2d 1190 (1996), Judge Davis spoke for the Court:

[W]e hold that the Maryland Legislature intended the forfeiture proceedings under § 297 to be civil.

*See also 1986 Mercedes Benz v. State,* 334 Md. at 273, 638 A.2d 1164 ("A forfeiture proceeding is a civil action *in rem.*"); *Ewachiw v. Dir. of Finance,* 70 Md.App. at 67, 519 A.2d 1327 ("[I]t is clear that the proceeding under this forfeiture statute is a civil *in rem* action. The action is not *in personam* against Ewachiw himself; it is *in rem* against the alleged contraband *per se.*"); *Thompson v. Grindle,* 113 Md.App. at 483, 688 A.2d 466 ("Forfeiture, although generally sought as a result of a criminal matter, is a civil *in rem* proceeding."); *Boyd v. Hickman,* 114 Md.App. at 119, 689 A.2d 106 ("Section 297 is a

civil *in rem* forfeiture statute."); *Howard County v. One 1994 Chevrolet Corvette,* 119 Md.App. at 102, 704 A.2d 455 ("[A] forfeiture action is a civil *in rem* proceeding.").

The Maryland cases have, moreover, not simply held that forfeiture under § 297 is a civil *in rem* proceeding but have substantiated those holdings with solid reasoning. Utilizing the Supreme Court's two-part test of *United States v. Ward* (a case with broad applicability beyond the Double Jeopardy Clause), Judge Wilner in *One 1984 Ford Truck* examined § 297 in various respects.

### 1. The Use of the Civil Burden of Persuasion

In addition to noting that § 297 has historically been viewed as civil, he pointed out that the civil burden of persuasion has invariably been applied to § 297 proceedings:

> That the Legislature intended the proceedings to be civil is evident in several respects: (1) as with the statutes scrutinized in *Ursery,* proceedings under § 297 are *in rem* proceedings and *in rem* proceedings have been traditionally viewed as civil proceedings; (2) the standard of proof applicable in forfeiture actions is preponderance of the evidence.

111 Md.App. at 205–06, 681 A.2d 527.

Judge Digges had referred to this characteristic of § 297 as early as *Prince George's County v. Blue Bird Cab:*

> [T]he burden of proof necessary to sustain it, [is] a mere preponderance of the evidence and not proof beyond a reasonable doubt.

263 Md. at 659, 284 A.2d 203. *See also 1986 Mercedes Benz v. State,* 334 Md. at 274, 638 A.2d 1164 ("[T]he burden of proof necessary to sustain a forfeiture is by a preponderance of the evidence."); *Ewachiw v. Dir. of Finance,* 70 Md.App. at 69, 519 A.2d 1327 ("[T]he Court of Appeals has regularly held the 'mere preponderance of the evidence' to be the appropriate burden of persuasion in these forfeiture proceedings."); *Allen v. State,* 91 Md.App. at 786, 605 A.2d 994 ("The standard of proof necessary to sustain a forfeiture action by the State is that of a mere preponderance of the evidence rather than the

criminal standard of proof beyond a reasonable doubt."); *Howard County v. One 1994 Chevrolet Corvette*, 119 Md.App. at 102, 704 A.2d 455 ("[T]he burden of proof necessary to sustain a forfeiture is that of a preponderance of the evidence.").

## 2. *The Forfeiture Forum Is a Civil Court*

In *State v. Greer*, 263 Md. at 694, 284 A.2d 233, Judge Digges had noted that forfeiture was not "an adjunct to a criminal case" and must be maintained as a separate action in a civil court. In *State v. Walls*, 90 Md.App. 300, 600 A.2d 1165 (1992), this Court picked up that theme from *State v. Greer* and held that a forfeiture could not be ordered as part of the criminal trial but that a separate proceeding was required. We further held that such a proceeding could not be filed in the criminal court but had to be filed in a civil court. In that case, Judge Rosalyn Bell spoke for this Court:

> *[T]he criminal court was without jurisdiction to hear Walls's petition* for return of his money. *It has long been held that forfeiture is a civil in rem proceeding against property, unconnected with any criminal proceedings against the owner or holder of the property.*

> Because Walls's basis for return of the money seized from him was Art. 27, § 297(d)(3)(ii), and because § 297 sets forth the statutory scheme for forfeitures, it is clear that *Walls's petition in this case should have been filed in a separate civil proceeding.*

90 Md.App. at 305–06, 600 A.2d 1165 (Citations omitted; emphasis supplied). *State v. One 1976 Dodge*, 65 Md.App. 482, 484–85, 501 A.2d 103 (1985) had also pointed out the necessity for "a full hearing" before the circuit court, as it rejected the State's contention that the circuit court should simply conduct a deferential "clearly erroneous" or "abuse of discretion" appellate review of the administrative decision by the police commissioner to recommend forfeiture.

### 3. No Criminal Act Need Actually Occur

As early as *Prince George's County v. Blue Bird Cab,* 263 Md. at 659, 284 A.2d 203, Judge Digges had observed that a criminal conviction was not a necessary precondition for a forfeiture:

Generally through the country the innocence of the owner is of no consequence.

*[I]t makes no difference whether there is any conviction of a crime related to those seized goods.* .

 Forfeiture under § 297, however, is even further removed from criminality. It is not only not necessary, as it sometimes was under older forfeiture laws, that there be an actual conviction of crime before a forfeiture can occur, it is not even necessary that the occurrence of a criminal act be proved in the forfeiture proceeding even by a bare preponderance of the evidence. By contrast with Maryland's § 297, the forfeiture law before the Supreme Court in *One 1958 Plymouth Sedan,* for instance, required a showing that the vehicle subject to forfeiture had actually been *"used* in the illegal manufacture or illegal transportation of liquor, etc." (Emphasis supplied). 380 U.S. at 694 n. 2, 85 S.Ct. at 1247 n. 2. Section 297(b)(4) is far broader. It covers, in diametric contrast, all vehicles and other conveyances "which are used *or intended for use* " to transport or to facilitate the transportation, etc., of contraband drugs. (Emphasis supplied).

This issue was squarely before the Court of Appeals in *State v. One 1988 Toyota Pick-up Truck,* 334 Md. 359, 639 A.2d 641 (1994). The owner of the pickup truck that was ultimately ordered to be forfeited attempted to purchase two rocks of crack cocaine from two undercover police officers posing as sellers of narcotics. What the officers gave the would-be purchaser, however, were "fakes" or "look alikes" which were non-narcotic. When the purchaser went to drive away in the pickup truck, he was placed under arrest and the truck was seized. His defense to the forfeiture was that the vehicle had not been *used* to transport *narcotics.* The judge who conducted the forfeiture hearing agreed with him and dismissed the

forfeiture petition. The Court of Appeals reversed. Chief Judge Murphy articulately summarized the State's contention that ultimately prevailed:

It was argued before us ... that *a motor vehicle which is intended for use in transporting* or in any manner facilitating the transportation, sale, receipt, possession, or concealment of CDS *is subject to forfeiture under § 297(b), even when that vehicle transports non-CDS purchased under the guise of being CDS.* In so contending, reliance was placed upon several federal cases that have so construed the federal forfeiture statute (21 U.S.C.A. § 881) which contains provisions virtually identical to § 297(b); these cases hold that a conveyance is forfeitable when it is *intended to be used* to facilitate the transportation, sale, receipt, possession, or concealment of CDS, even if CDS is not actually present in the conveyance.

334 Md. at 367, 639 A.2d 641 (Emphasis supplied; emphasis in original).

The holding of the Court of Appeals was clear:

[B]ecause the plain language of § 297(b)(4) encompasses an "intent" to use a motor vehicle to facilitate possession and transportation of CDS, we share the view of those federal courts that such an intention to possess CDS, believing it to be CDS, even though it is not, is within the coverage of § 297(b)(4) ... Indeed, it is crystal clear from the stipulated facts that Willard intended to purchase and possess cocaine and to utilize his motor vehicle to facilitate that goal.

334 Md. at 373, 639 A.2d 641.

In *One 1984 Ford Truck,* 111 Md.App. at 206, 681 A.2d 527, Judge Wilner contrasted this broad reach of the civil forfeiture law with the far narrower reach of the related criminal statute:

[T]he statute reaches property used in violation of law *and those "intended to be used"* in such a manner, thus *it*

*reaches a broader range of conduct than the criminal statute.*

(Emphasis supplied).

When § 297 applies in circumstances such as those, there is no way that the forfeiture can be deemed a punishment for a crime that, by a fortuitous twist of fate, never occurred.

### 4. An Allegedly Innocent Owner Must Prove His Innocence

In yet another significant respect, forfeiture is not an additional punishment (or, necessarily, any punishment at all) meted out to a criminal agent. Although Maryland has since 1972 provided an "innocent owner" defense, an innocent owner may nonetheless still be the party suffering the forfeiture. Even the innocent owner bears the burden of filing a timely claim for the return of property subject to forfeiture. As Chief Judge Wilner noted in *One 1984 Ford Truck*, 111 Md.App. at 206, 681 A.2d 527, "[T]he property may be subject to forfeiture without a hearing if no one files a timely answer. Sect. 297(h)(6)(ii)."

 In a criminal trial, moreover, the burden of proving a criminal *mens rea* is allocated to the State. In a § 297 forfeiture proceeding, by contrast, the burden of ultimate persuasion is cast on the party claiming to be an innocent owner to prove that innocence. In *State v. One 1985 Ford*, 72 Md.App. 144, 527 A.2d 1311 (1987), we reversed the dismissal of a forfeiture petition by the trial judge for his failure properly to place that burden on the allegedly innocent owner of a vehicle whose son, returning from Ocean City, had been arrested in his mother's car in possession of marijuana. We stated, 72 Md.App. at 147–48, 527 A.2d 1311:

The legislative scheme is clear. We hold that once the illicit use of the vehicle is shown, the vehicle is presumptively subject to forfeiture and *the burden of proof is upon the owner to demonstrate entitlement to an exemption* from that presumptive forfeiture. The burden here was upon Jean Marie Gluck to show 1) that she did not know and 2)

that there was no reason that she should have known that her son was using her automobile to transport, to possess, or to conceal drugs. The summary dismissal of the petition at the end of the State's case relieved Jean Marie Gluck of *this burden of proof properly allocated to her.* Jean Marie Gluck may well have been able to demonstrate her entitlement to an exemption from the forfeiture statute, but she could well have been subjected to cross-examination about knowledge of her son's drug history and about awareness of his then-present condition with respect to drugs.... [The owners erroneous position] betrays the mistaken belief that *the burden is allocated* to the State to prove knowledge rather than *to the owner to prove lack of knowledge.* The State, in this case, was prejudiced by being erroneously saddled with a burden of proof that should not rightfully have been placed upon it.

(Emphasis supplied).

### 5. The Significance of § 297's Characterization as "Civil" Goes Beyond the Double Jeopardy Clause

■ Although some of the more recent Maryland forfeiture decisions have, as a direct response to the *Halper—Kurth Ranch—Austin* flareup, analyzed the fundamentally civil *in rem* characteristics of a § 297 forfeiture in the context of the Double Jeopardy Clause, the basic characterizations are by no means that narrowly limited. *Ewachiw v. Director of Finance,* 70 Md.App. 58, 519 A.2d 1327 (1987), by contrast, was a case where the dispositively civil, rather than criminal, nature of § 297 was examined in the context of the general Due Process Clause of the Fourteenth Amendment. Under § 297(b)(6), any cash "found in close proximity to contraband" drugs is "presumed to be forfeitable" without the State being required to prove anything else. "The burden of proof is upon a claimant of the property to rebut this presumption." On appeal from a forfeiture order, Ewachiw claimed that § 297 unconstitutionally deprived him of his due process right to have the State prove the case against him. In rejecting that

contention, we stressed the civil nature of a § 297 forfeiture proceeding:

> The legal answer is that this is not a criminal case. *In re Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)] and all of its progeny are concerned only with criminal prosecutions. Permeating the entire discussion in *In re Winship* is the special protection given to defendants facing conviction for a violation of the criminal law. The holding of *In re Winship*, which is the doctrinal point of departure for this entire body of law, is that "the Due Process Clause protects *the accused* against *conviction* except upon proof beyond a reasonable doubt of every fact necessary to constitute *the crime* with which he is charged." By way of contrast, it is clear that the proceeding under this forfeiture statute is a civil *in rem* action. The action is not *in personam* against Ewachiw himself; it is *in rem* against the alleged contraband *per se*.

> If the statute casts ... the burden of ultimate persuasion upon the owner of the property subject to forfeiture to provide an explanation for the presence of the cash which is *not only theoretically believable but* which is *actually believed* by the fact finder, that burden would be compatible with the tone and stated purpose of the forfeiture statute.

70 Md.App. at 67–68, 519 A.2d 1327. (Citations omitted; emphasis in original).

The civil or criminal character of a forfeiture proceeding is not a chameleon that randomly changes color as it meanders through the various provisions of the Bill of Rights.

## XIV.

### Conclusion

■■■ Under currently prevailing criteria as to what is civil and what is criminal, courts no longer presume, *sua sponte*, to pin the hybrid labels of "quasi-criminal" or "partly punitive" on forfeiture proceedings and to attach constitutional protections on the basis of such labeling. The guiding principle, rather, is one of essential judicial deference to legislative

intent as to 1)what is civil, 2) what is criminal, and 3) what shall be the procedural and constitutional consequences of such legislative determinations.

 Whatever may have been the status of other forfeiture proceedings, past or present, here or abroad, it is demonstrably evident that the General Assembly of Maryland intended Art. 27, § 297 to be a civil *in rem* proceeding. There is a total absence of the required "clear proof" that Maryland's "statutory scheme [is] so punitive either in purpose or effect as to negate that intention." The undiluted civil status of the proceeding before us is a given.

 On that basis, we hold that the Exclusionary Rule of *Mapp v. Ohio* does not apply to a civil *in rem* forfeiture proceeding pursuant to § 297. Although many lower court decisions, state and federal, have uncritically assumed that the Exclusionary Rule would apply to all forfeiture proceedings, the Supreme Court has never held it to apply to a proceeding of an unquestioned civil and *in rem* nature. We rely in this regard on the Supreme Court decision of *United States v. Janis.* In that case, expressly aware of *One 1958 Plymouth Sedan* that had been decided eleven years before, the Supreme Court nonetheless stated in absolute terms:

**IN THE COMPLEX AND TURBULENT HISTORY OF THE [EXCLUSIONARY RULE], THE COURT NEVER HAS APPLIED IT TO EXCLUDE EVIDENCE FROM A CIVIL PROCEEDING, FEDERAL OR STATE.**

428 U.S. at 447, 96 S.Ct. at 3029 (Footnote omitted; emphasis supplied).

The Court of Appeals has read the Supreme Court's approach to the application of the Exclusionary Rule precisely as we now read it. In *Chase v. State,* decided twenty-two years after *One 1958 Plymouth Sedan* and expressly recognizing the existence of that case, the Court of Appeals declared unequivocally:

**THE IMPRIMATUR OF THE SUPREME COURT ON THE APPLICATION OF THE EXCLUSIONARY RULE**

**HAS BEEN CONFINED TO CRIMINAL TRIALS,** and within those trials, to the prosecution's case in chief on the merits of guilt or innocence.

309 Md. at 245–46, 522 A.2d 1348 (Emphasis supplied).

In this case, the trial judge erroneously applied the Exclusionary Rule and excluded all evidence of the 535 grams of high-grade cocaine found, along with its packaging, in the 1995 Corvette that is the subject of this forfeiture action. Accordingly, he dismissed the State's complaint seeking forfeiture. That judgment is hereby reversed and the case is remanded for further proceedings.

*JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.*